BROOKRIDGE PARTY CENTER, INC.. APPELLEE, *v.* FISHER FOODS, INC., APPELLANT, ET AL.

(Nos. 46181 and 46214—Decided September 6, 1983.)

*Mr. Nicholas M. DeVito,* for appellee Brookridge Party Center, Inc.

*Mr. Robert G. Quandt,* for appellant, third-party plaintiff-appellee, Fisher Foods, Inc.

*Mr. John B. Robertson, Mr. Neil E. Roberts* and *Mr. L. Edward York,* for third-party defendant-appellant Paul Lipman, trustee.

*Mr. Henry F. DeBaggis,* for third-party defendant-appellee Bond Constr. Co.

MARKUS, P.J. Plaintiff-party center and defendant-grocery store ("Fisher") are tenants in landlord's shopping center, with the party center located beneath the grocery store. The party center obtained a jury verdict against Fisher with compensatory and punitive damages for causing water leakage onto the party center's premises. The jury also found for Fisher on its contribution claim against the builder for defects allegedly causing that leakage, "in the sum of $0." The trial judge separately granted Fisher indemnity from the landlord for all damages, on the basis of a lease provision.

Fisher and the landlord appeal. Fisher asserts: (1) the trial court should not have submitted the punitive damages claim for jury consideration, and (2) the zero verdict against the builder was contrary to the manifest weight of the evidence. The landlord complains: (1) the disputed lease provision did not justify indemnity for Fisher's own negligence or for punitive damages, and (2) the trial

court should have submitted a requested jury interrogatory. Both Fisher and the landlord contest rulings which allowed an economist to testify about the party center's decreased revenues.

We affirm the party center's judgment against Fisher for both compensatory and punitive damages, and the judgment on Fisher's contribution claim against the builder. We modify Fisher's judgment against the landlord by eliminating any indemnity for punitive damages.

## I. Punitive Damages

Fisher's first two assigned errors challenge the verdict for punitive damages, arguing that plaintiff's pleading made no such claim and no evidence supported it.

## A. The Pleading

Punitive damages need not be specially pleaded or claimed. They are recoverable if the evidence warrants their allowance.[1] *Giovinazzi* v. *Chapman* (Aug. 26, 1982), Cuyahoga App. No. 44241, unreported; cf. *Raimonde* v. *Van Vlerah* (1975), 42 Ohio St. 2d 21, at 26-27 [71 O.O.2d 12]. However, Fisher's brief contends that punitive damages are foreclosed here by Civ. R. 54(C):

"* * * Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled; however, a demand for judgment which seeks a judgment for money shall limit the claimant to the sum claimed in the demand unless he amends his demand not later than seven days before the commencement of the trial. * * *"

Although plaintiff's pleading did not separately claim any amount for punitive damages, it did seek damages in the sum of $1,020,000. The verdict and judgment granted plaintiff $234,500 compensatory damages and $215,500 punitive damages. Thus, the total damages assessed were less than forty-five percent of the amount claimed.

The limitation in Civ. R. 54(C) serves to assure the defendant that recovery cannot exceed the amount claimed in the final pretrial pleading. See Staff Note to Civ. R. 54(C). This plaintiff's judgment did not violate that assurance. Fisher's brief relies on this court's ruling in *Roveri* v. *Zayre Corporation* (May 7, 1981), Cuyahoga App. No. 42789, unreported. In *Roveri,* the panel approved a reduction of compensatory damages to the amount separately claimed for that species of damage, citing *Sparks* v. *Y. & T. Co.* (1952), 67 Ohio Law Abs. 47.

Both *Roveri* and *Sparks* seem to treat different forms of damage that are separately pleaded as distinct causes of action. By that analysis, a plaintiff would be limited to the amount claimed for each individual cause of action. Without deciding whether that approach has merit in other situations, we conclude that it has no application here. This plaintiff did not assert separate claims in differing amounts for compensatory and punitive damages.

## B. The Evidence

The jury may assess punitive damages for intentional, reckless, wanton, or grossly negligent conduct which manifests actual malice. *Detling* v. *Chockley* (1982), 70 Ohio St. 2d 134 [24 O.O.3d 239]; *Leichtamer* v. *American Motors Corp.* (1981), 67 Ohio St. 2d 456

---

[1] The transcript also reflects that plaintiff had previously filed and later withdrew an amended pleading which expressly claimed punitive damages. All counsel were well aware that this was a potential subject for proof. No party objected to evidence supporting the punitive damage claim "on the ground that it is not within the issues made by the pleadings." Civ. R. 15(B). Consequently, this issue was tried by express or implied consent, so it is treated as if it had been raised by the pleadings. *Id.*

[21 O.O.3d 285]; *Columbus Finance* v. *Howard* (1975), 42 Ohio St. 2d 178 [71 O.O.2d 174].

Factors which tend to show malice include:

(1) The duration of offensive conduct.

(2) An apparent lack of concern for the rights of others.

(3) The availability of alternative methods which would avoid damage to others.

(4) The feasibility of such alternatives.

(5) Knowledge of adverse consequences from that conduct.

(6) The probability that harm will occur to others from that conduct.

See *Hawkins* v. *Ivy* (1977), 50 Ohio St. 2d 114, at 117-118 [4 O.O.3d 243]; *Gearhart* v. *Angeloff* (1969), 17 Ohio App. 2d 143, at 146 [46 O.O.2d 207]; *Schmidt* v. *Lanz* (July 1, 1982), Cuyahoga App. No. 44248, unreported.

In this case, plaintiff presented evidence that the party center sustained water damage from 1976 to 1980. Originally, that water apparently came from condensation when Fisher's freezers and coolers affected poorly insulated water pipes. Despite plaintiff's complaints, plaintiff's witnesses said Fisher repeatedly allowed its freezers to defrost on the open floor. Its freezer doors and hot water tanks leaked. Larger quantities of water reached the party center when Fisher washed its floors with "power hoses."

Plaintiff's evidence showed that Fisher permitted its floor drains to become blocked with meat, fat scraps, and plastic bags. Its personnel removed drain covers and strainers to facilitate their elimination of such materials. Plaintiff's owner testified that they complained hundreds of times, and that Fisher's personnel sometimes responded with callous apathy.

A health department inspector testified that he demonstrated leakage from Fisher to the party center with dye tests.

He ordered Fisher to discontinue using power hoses for floor cleaning. Thereafter, Fisher sometimes used hoses and sometimes used alternative floor cleaning procedures which had been available earlier. On one occasion, Fisher refused to turn off water from a broken line for ten to twelve hours because the line serviced its bakery.

During part of this time, the party center incurred daily expense for the replacement of expensive ceiling tiles. It hired extra employees and paid its regular employees overtime to pump water from its premises. The carpet sustained substantial damage. Dripping water disrupted its customers' activities. Although Fisher had knowledge of these problems, plaintiff's evidence showed that Fisher continued the practices which caused them.

Fisher presented contrary evidence, which tended to show an affirmative desire to help the party center's problem, but a need to comply with cleanliness standards. In brief, Fisher contended that its procedures were necessary to its business.

The jury resolved those disputes from conflicting evidence. They believed plaintiff's evidence and found actual malice in accordance with the court's definition of that term. Fisher does not challenge the language used in the court's instructions on this subject. Nor does Fisher contend that the amount of punitive damages was excessive. Rather, Fisher argues that plaintiff presented insufficient evidence for the jury to consider any punitive damages. We conclude that the evidence sufficiently supported those instructions and the resulting verdict.

Fisher's first and second claimed errors are overruled.

II. Landlord's Indemnity Obligation

Fisher sought indemnity from its landlord, claiming that any damage resulted from the landlord's failure to maintain water and sewer lines. Further, landlord accepted certain indemnity

obligations by the terms of their lease. The trial court removed this claim from the jury's consideration, deciding that its resolution depended on judicial interpretation of the lease contract. Fisher expressed no objection to that procedure. In its ruling, the trial court found that landlord's indemnity obligation rested solely on the "indemnification agreement contained in the lease."

Both the landlord and Fisher agree that the only lease provision involved is Paragraph 17(b)(6)[2]:

"Lessor shall indemnify and hold harmless Lessee from any liability, loss, cost or damage arising out of damage to any property belonging to Tenants of the Shopping Center occupying premises beneath the Demised Premises resulting from water that may leak or flow from any part of the Demised Premises or from bursting or stoppage of water, gas or sewer lines."

### A. Indemnity For Negligence

Landlord denies any indemnity obligation for Fisher's liability from negligence by Fisher's own employees. To support its positions, landlord cites authorities which deny indemnity for the indemnitee's own neglect unless the agreement expressly so provides. *E.g., Dingledy Lumber Co.* v. *Erie RR. Co.* (1921), 102 Ohio St. 236, *Kay* v. *Pennsylvania RR. Co.* (1951), 156 Ohio St. 503 [46 O.O. 417].

Fisher contends that the agreement covers that liability without using such specific language, citing decisions which interpret somewhat comparable contracts. *E.g., Allen* v. *Standard Oil Co.* (1982), 2 Ohio St. 3d 122; *D'Onofrio* v. *Sun Oil Co.* (C.A. 6, 1960), 277 F.2d 543 [14 O.O.2d 75].

Landlord attempts to distinguish the adverse authorities, contending that those cases involve inherently dangerous activities where indemnity provisions are more commonly used. However, the decisions in those cases give little or no weight to the nature of the underlying activity, or the frequency of such indemnity agreements.

Further, indemnity agreements are becoming commonplace for numerous commercial transactions, including commercial leases. Such agreements serve a function similar to fire loss provisions. They seek to assign anticipatable risks of loss to one or both parties, for commercial convenience in allocating transaction costs. The party who accepts a risk can then obtain insurance protection against that potential loss, or undertake the status of a self-insurer.

In this case, the disputed paragraph clearly assigns to landlord the risk of liability for water damage suffered by the tenant beneath Fisher. The parties obviously anticipated some potential risk that Fisher's grocery business might cause such damage. Testimony by the lease negotiators confirmed that fact.

The parties presumably anticipated any reasonably foreseeable liability for that specific damage. Negligence by Fisher's employees was a reasonably foreseeable cause for water damage to that tenant. The agreement expressly applies to "any liability, loss, cost, or damage." That broad language encompasses negligence liability. Therefore, both the circumstances surrounding the lease provision and its clear language demonstrate its applicability to liability for water damage from Fisher's negligence.

Landlord contends that the indemnity agreement covers liability for physical damage to premises but not liability for business losses. The agreed terms govern

---

[2] We note that Paragraph 22(a) of the lease requires Fisher to maintain general liability insurance for stated limits of liability. Landlord does not contend that this provision reduces its indemnity obligation to Fisher's liability beyond those stated limits. Therefore, we have not considered the possible significance of Paragraph 22(a).

liability "arising out of damage to any property belonging to" the party center. That language includes liability for resulting business losses as well as liability for damage to the property itself. Here again, such business losses were reasonably anticipatable liability risks. Thus, the agreement and the surrounding circumstances establish landlord's obligation to accept that responsibility.

### B. Indemnity For Punitive Damages

Landlord disclaims responsibility for punitive damages assessed against Fisher, arguing that such indemnity contravenes public policy and exceeds its contractual undertaking.

While some jurisdictions expressly authorize insurance for punitive damages, others construe indemnity contracts to exclude that liability on public policy grounds. See Annotation, Liability Insurance Coverage as Extending to Liability for Punitive Exemplary Damages (1968), 20 A.L.R. 3d 343.

Courts which deny contractual indemnity for punitive damages reason that the culpable tortfeasor escapes the intended punishment if those damages are paid by another. Some Ohio decisions suggest that analysis. See, *e.g.*, *Blankenship* v. *Cincinnati Milacron Chemicals* (1982), 69 Ohio St. 2d 608, at 615 [23 O.O.3d 504]; *Willowick Towers Investment Co.* v. *General Ins. Co. of America* (Sept. 22, 1980), Lake App. No. 7-239, unreported, at pages 2-3.

Courts which allow insurance for punitive damages conclude that the insurer willingly accepted this risk by drafting policy language and accepting commensurate premiums. Those decisions generally apply to insurance contracts where protection against potential liability is the focus of the transaction. Some of them concern an employer's liability insurance; those courts consider that punitive damages assessed for employee misconduct have less deterrent significance. They do not involve indemnity provisions in commercial sales or leases, where protection from liability is incidental to a larger transaction.

We decline to make any broad generalization that public policy necessarily precludes indemnity for punitive damages in any situation. However, we agree with landlord that this indemnity provision does not cover Fisher's punitive damages. Punitive damages arise from reprehensible conduct by a tortfeasor, coincident with some compensable damage to the tort victim. They do not arise from the victim's damages, and the victim's damages do not determine their magnitude. This indemnity agreement covers liability "arising out of damage to any property belonging to" the party center.

Additionally, punitive damages for highly reprehensible conduct were not reasonably foreseeable when landlord signed this lease. Unlike negligence, such extraordinary misconduct exceeds the usual anticipation of parties who agree on incidental indemnity provisions during negotiations about broader transactions. Thus, neither the language of this agreement nor its surrounding circumstances justify the judgment requiring landlord to indemnify Fisher for punitive damages.

Landlord's first assigned error is sustained in part; this agreement did not require landlord to indemnify Fisher for punitive damages. Otherwise, landlord's first two claimed errors lack merit.

### III. Fisher's Contribution Claim Against The Builder

Fisher presented evidence that the shopping center builder failed to provide floor insulation described in the contract specifications. Its evidence also tended to show that builder installed floor drains and caulked joints defectively without adequate seals. Therefore, Fisher claimed that the builder was at least partly responsible for the party center's water damage.

The builder denied that liability, with evidence tending to show that its work was satisfactory and not a proximate con-

tributing cause of any damage.[3] Its owner testified that the building conformed with plans and specifications which Fisher had drafted. State and local building inspectors approved the completed building. Party center witnesses traced the water problems to Fisher's activities rather than building defects. Fisher's counsel acknowledged in oral argument that the evidence at trial would not justify a directed verdict against the builder.

The jury returned a verdict on this third-party claim for contribution:

"The jury in this case, being duly empaneled and Sworn, upon the concurrence of the undersigned Jurors, being not less than three-fourths of the whole number thereof, do find for the 3RD Plaintiff FISHER FOODS, INC. in the sum of $0 AGAINST BOND CONSTRUCTION CO."

All eight jurors signed that verdict. The jurors had been supplied another jury verdict form which they returned unsigned. That unsigned form would have been used if the jury had found "for the 3RD PARTY Defendant, BOND CONSTRUCTION, INC. ON THE THIRD PARTY COMPLAINT OF FISHER FOODS, INC."

In its judgment "JOURNAL ENTRY," the court repeated the jury's "verdict for Fisher Foods, Inc. in the sum of No Dollars against Bond Construction Company." The court's entry did not interpret or characterize that verdict. Since that order constituted a final judgment for all other parties, we construe it as a judgment for Fisher on its contribution claim against the builder with no resulting damages.[4]

Fisher contends that such a judgment is contrary to the manifest weight of the evidence, or is so ambiguous that it is a nullity. We find substantial credible evidence that any negligence by the builder did not proximately contribute to the party center's damages. Therefore, we cannot conclude that the finding of no contribution damages was against the manifest weight of the evidence. Cf. *C. E. Morris Co.* v. *Foley Construction Co.* (1978), 54 Ohio St. 2d 279 [8 O.O.3d 261].

With regard to the claimed ambiguity of the verdict and judgment, we must uphold the judgment if it is reasonably clear and enforceable. Fisher argues that the verdict and judgment could mean the jury was confused about the meaning or significance of proximate causation. We see no basis for that conclusion. The trial court might have eliminated any doubt by requesting the jury to clarify its verdict or by polling them to confirm their apparent intent. Cf. *Barnes* v. *Prince* (1974), 41 Ohio App. 2d 244 [70 O.O.2d 454]; *Kahley* v. *Rus* (June 29, 1978), Cuyahoga App. No. 37397, unreported. However, counsel waived any possible objection to the allegedly ambiguous verdict when they failed to object then or to request the court to inquire further. *Wulftage Iron Works, Inc.* v. *Lakes* (Dec. 26, 1979), Butler App. No. 77-01-0001, unreported.

Fisher's third assignment of error is overruled.

IV.   The Economist's Testimony

Landlord and Fisher argue that the court should not have allowed an economist to testify about the party center's decreased revenues. The party center called that witness to support its claim of business losses. Neither the landlord nor Fisher challenges the witness' qualifications to give expert

---

[3] The builder does not challenge Fisher's standing to assert a negligence claim without privity to the construction contract.

[4] The order makes no express disposition of the builder's counterclaim against Fisher for malicious prosecution, but the recited adjudication in Fisher's favor implicitly denies builder's counterclaim. Consequently, the trial court's failure to enter any judgment on that counterclaim does not deprive this court of appellate jurisdiction. Cf. *Wise* v. *Gursky* (1981), 66 Ohio St. 2d 241 [20 O.O.3d 233].

testimony on subjects relating to the economy and business activity. Rather, they contend (a) the witness improperly assumed that water damage caused the business losses, and (b) business losses are not recoverable by a company with no history of profits.

In fact, the witness repeatedly denied that he assumed any particular cause for the business losses. He compared the gross revenues for three years of business activity before the reported water problem with gross revenues for the next three years. He then expressed an expert opinion that impaired business activity will typically overcome past impediments in approximately three years after those impediments terminate. Consequently, he extrapolated the calculated revenue losses for an additional three years.

In large part, the witness merely accomplished arithmetical calculations from the party center's unchallenged revenue data. To the extent that he supplied opinion testimony, his testimony was admissible in the court's discretion to assist the jury. Evid. R. 702; cf. *Hesse* v. *Columbus, Sandusky & Hocking RR. Co.* (1898), 58 Ohio St. 167; *Senn* v. *Lackner* (1951), 91 Ohio App. 83 [46 O.O. 331]. He was not qualified to give an opinion about the cause of the demonstrated decrease in revenues. He did not do so.

If other evidence failed to show that the decreased revenues resulted from the water problem, then the court should have instructed the jury not to consider those decreased revenues in determining damages. Neither Fisher nor the landlord requested such a jury instruction. Neither of them objected to contrary instructions which the court did give to the jury. They have thereby waived any challenge to those instructions. Civ. R. 51(A). Indeed, they assign no claimed error in those instructions on this appeal.

Fisher and the landlord also contend that business losses are not proper damages here because the party center's tax returns showed consistent losses. The party center contended that its previous experience produced favorable cash flow, but intangible expenses like depreciation produced a net tax loss. Since it was a going business with reportedly favorable prospects, we cannot say lost revenues are too speculative for assessment. Cf. *Hickman* v. *Coshocton Real Estate Co.* (1936), 58 Ohio App. 38 [11 O.O. 425].

Further, any objection to such damages did not attack the propriety of this expert's testimony. His calculations and conclusions were a basis for determining decreased revenues, if they were otherwise properly recoverable. Again, the propriety of those damages was a matter addressed in the jury instructions. Without a proper complaint about the instructions, no issue is presented for our review.

Fisher's and the landlord's fourth assignments of error are each overruled.

V. The Jury Interrogatory

Landlord claims that the trial court erroneously refused to submit a requested jury interrogatory. The court reportedly rejected several proposed interrogatories. However, landlord complains only about the court's refusal to approve a jury interrogatory regarding the party center's possible assumption of the risk.[5]

We must overrule this claimed error because landlord has failed to include the purportedly requested interrogatory in the trial record. See App. R. 12(A); cf.

---

[5] The party center's principals had substantial knowledge about the history of the building and Fisher's tenancy. One of those principals owned the construction company that built the shopping center. Another principal was a major participant in the company that acquired the land, developed the shopping center, hired the builder, and arranged Fisher's lease. Indeed, that man personally negotiated Fisher's lease terms as the developer's representative. The trial court instructed the jury that the party center would be barred from recovery if is assumed the risk of its claimed water damage.

*Knapp* v. *Edwards Laboratories* (1980), 61 Ohio St. 2d 197 [15 O.O.3d 218]; *Crow* v. *Brite Metal Treating, Inc.* (1967), 9 Ohio St. 2d 63 [38 O.O.2d 161]. This court is limited by law to a review of possible errors exemplified in the record. Landlord argues that the trial court refused to allow its counsel to read the proposed interrogatories into the trial transcript.

Landlord gives no explanation why it did not proffer the written requests to the court reporter or otherwise cause their inclusion in the record. Whenever a trial court restricts counsel's immediate access to the record, the attorney can fulfill his or her needs for an appellate review by:

(1) filing a motion with the court clerk requesting the designated ruling;

(2) making an oral proffer of the rejected materials when the court later permits access to the transcript of oral proceedings;

(3) preparing a bystander's bill; or

(4) submitting a post-trial motion for new trial with one or more supporting affidavits from counsel, the court reporter, or others.

See *State* v. *Thornton* (June 16, 1983), Cuyahoga App. No. 45820, unreported.

Landlord refers to a purported copy of the disputed interrogatory which its counsel attached to its appellate brief. If this court considered such materials, it would disregard all the safeguards for accuracy and reliability of a proper appellate record. Absent a contrary showing in the record, we presume regularity in the trial court's proceedings. Cf. *Linde* v. *Stefanchin* (1962), 90 Ohio Law Abs. 494; *Kahn's Jewelers* v. *Truss* (1960), 112 Ohio App. 341 [16 O.O.2d 272].

Finally, the trial court could have properly rejected the jury interrogatory attached to landlord's appellate brief.[6] That purported question may well have satisfied the conditions for mandatory submission under Civ. R. 49(B), if it stood alone. However, the document attached to landlord's appellate brief lists this question in a series of three interrogatories on a single sheet. That sheet calls for a single set of juror signatures to concur in the three answers collectively. The first two questions inquire about possible contributory negligence by the party center.

The trial court ruled that the evidence failed to justify any instruction about contributory negligence. No party challenges that ruling by an assigned error on this appeal. Having submitted a package of interrogatories, landlord cannot complain that the court rejected the group when the larger part of the questions was improper.

This third error assigned by landlord's counsel is overruled.

We modify the trial court's judgment by reducing Fisher's indemnity judgment against the landlord (Lipman) from $450,000 to $234,500, thereby excluding indemnity for punitive damages. As so modified, the judgment is affirmed.

*Judgment affirmed*
*as modified.*

DONOFRIO, J., concurs.

DAHLING, J., concurs in part.

DONOFRIO, J., of the Seventh Appellate District, sitting by assignment in the Eighth Appellate District.

DAHLING, J., of the Eleventh Appellate District, sitting by assignment in the Eighth Appellate District.

DAHLING, J., concurring. I concur with the majority opinion except as to punitive damages.

Since the plaintiff did not plead for

---

[6] That interrogatory asks: "Do you find that the Plaintiff, Brookridge Party Center, Inc., through its officers and employees, assumed the risk of the damages that it seeks recovery of?"

138

punitive damages, in my view, it was error to grant punitive damages. The fact that the total compensatory claim exceeds the total judgment is not persuasive.

However, if it was not error to allow punitive damages, then I would reduce the punitive damages to $25,000. In my view, Fisher was, in general, doing what it had the right to do. It certainly cannot be faulted for having pipes, freezers, and coolers that sweat and defrost. Nor can it be criticized for hosing its meat cutters and grinders.

It can be held liable for permitting the drains to be plugged thus causing excess water to drain down on plaintiff. It is liable for permitting water to run for ten to twelve hours from a broken pipe.

In my view, a generous allowance for punitive damages is $25,000. Anything more is motivated by the popular view of socking the big corporations.