812 F.2d 1407
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
HYDRO-DYNE, INC., Plaintiff-Appellee,
v.
ECODYNE CORPORATION, Trans Union Corporation, Defendants,
The Affiliated FM Insurance Company a/k/a Factory Mutual
System a/k/a Factory Mutual Engineering,
Third-Party Defendant-Appellant.
 No. 85-3574.
 United States Court of Appeals, Sixth Circuit.
 Jan. 13, 1987.
 
 Before MARTIN, MILBURN and BOGGS, Circuit Judges.
 MILBURN, Circuit Judge.
 
 
 1
 Third-party defendant-appellant The Affiliated FM Insurance Company ("Affiliated") appeals from the judgment of the district court granting summary judgment in favor of plaintiff-appellee Hydro-Dyne, Inc. ("Hydro-Dyne") on its breach of contract claim and against Affiliated on its counterclaim for indemnification. Having concluded that no genuine issue of material fact exists and that Hydro-Dyne is entitled to judgment as a matter of law on both claims, we affirm.
 
 I.
 
 2
 The present litigation arises out of a series of contractual agreements in which Hydro-Dyne agreed to construct pressure vessels for Ecodyne Corporation. Hydro-Dyne retained Affiliated to perform inspections of the pressure vessels to insure that they complied with the provisions of the American Society of Mechanical Engineers ("ASME") Code.
 
 
 3
 The pressure vessels which are the subject of the present litigation were constructed by Hydro-Dyne at its plant in Massillon, Ohio. On March 21, 1980, final testing of the vessels was completed, and the vessels were approved by Affiliated's inspector. The vessels were then shipped to their final destination, a paper mill construction site in Rumford, Maine. Subsequently, the pressure vessels were found to be defective because they did not comply with the ASME Code, and Ecodyne incurred $382,335.67 in expenses related to the repair of the pressure vessels.
 
 
 4
 On July 16, 1980, Hydro-Dyne filed an action in the Court of Common Pleas for Stark County, Ohio, against Ecodyne for the contract price. Ecodyne removed the case to the United States District Court for the Northern District of Ohio pursuant to 28 U.S.C. Sec. 1441(a). In its answer, Ecodyne raised defenses including breach of warranty and failure of consideration. Ecodyne also filed a counterclaim for the amount of damages incurred as the result of Hydro-Dyne's failure to deliver pressure vessels complying with the ASME Code.
 
 
 5
 Hydro-Dyne then filed a third-party complaint against Affiliated, alleging that Affiliated had inspected the pressure vessels in a negligent and reckless manner, that Affiliated had breached its contract with Hydro-Dyne, and that it had breached written and implied warranties that the pressure vessels were constructed in accordance with the code. Hydro-Dyne further alleged that Affiliated was guilty of reckless, wanton, malicious, and unprofessional conduct in failing to uphold the inspections and certificates it made for the pressure vessels after they arrived in Maine. Hydro-Dyne asserted that any damages sustained by Ecodyne resulted from Affiliated's conduct.
 
 
 6
 Affiliated then filed an answer, alleging that Hydro-Dyne had waived any claims against it. Affiliated asserted that it had disclaimed any warranties relative to the inspection service, and that Hydro-Dyne had itself breached the contract. Affiliated also filed a counterclaim against Hydro-Dyne, alleging that Hydro-Dyne had assumed full responsibility for compliance with the ASME code of each object manufactured for Ecodyne, and that Hydro-Dyne had agreed to hold Affiliated harmless for any liability to Hydro-Dyne or others for property damage caused by or in any way connected with the services to be performed under the contract. Thus, Affiliated asserted that it was entitled to indemnification from Hydro-Dyne for any damages that it was required to pay as a result of the ongoing litigation.
 
 
 7
 Ecodyne then filed a cross-claim against Affiliated, alleging that Ecodyne had relied on the inspection certificates provided by Affiliated, and that as a result of this reliance, Ecodyne had accepted the pressure vessels in Rumford, Maine. Because the pressure vessels did not meet code requirements, Ecodyne was required to expend in excess of $300,000 to remedy the defects. Ecodyne alleged that it had a right to rely on the inspection agreement, because the code requirements were established for the protection of the customer of the products and the public, and that Affiliated was liable for the expenses incurred by Ecodyne in repairing the pressure vessels.
 
 
 8
 Thereafter, Affiliated amended its counterclaim against Hydro-Dyne, alleging that under the terms of the Hydro-Dyne-Affiliated inspection agreement, Hydro-Dyne would be required to indemnify Affiliated for any damages it was required to pay as a result of its dispute with Ecodyne. After giving notice to Hydro-Dyne, Affiliated settled its dispute with Ecodyne for $140,000.
 
 
 9
 On September 27, 1983, Affiliated filed a motion to sever the claims between Affiliated and Hydro-Dyne from those claims involving Hydro-Dyne and Ecodyne. The motion was granted, and the action between Hydro-Dyne and Ecodyne proceeded to trial.
 
 
 10
 On December 27, 1983, the district court entered findings of fact and conclusions of law with respect to the action between Hydro-Dyne and Ecodyne. The district court concluded that Ecodyne had accepted the vessels when they were approved by Affiliated's inspector in Massillon, Ohio, and, therefore, Hydro-Dyne was entitled to the full contract price. The district court allowed Ecodyne to recover on its counterclaim in the amount of $224,037.51. This amount was set off against the remaining contract price, and Hydro-Dyne's remaining liability to Ecodyne was $108,139.51.
 
 
 11
 Subsequently, the proceedings between Hydro-Dyne and Affiliated began. Affiliated filed a motion for summary judgment, contending that it was entitled as a matter of law to indemnification for the amount it had paid in settlement to Ecodyne, pursuant to the indemnification provision in its contract with Hydro-Dyne. Affiliated also contended that it was entitled to judgment as a matter of law on the claims presented against it by Hydro-Dyne. Hydro-Dyne filed a cross-motion for summary judgment, contending that it was entitled to recover for Affiliated's breach of contract, and that Affiliated was not entitled to indemnification for the amount that Affiliated had paid in settlement with Ecodyne.
 
 
 12
 The district court granted Hydro-Dyne's motion for summary judgment with respect to its third-party complaint and entered summary judgment against Affiliated on its counterclaim for indemnification. The order granting summary judgment as to liability was filed on December 7, 1984, and the district court ordered a hearing to determine damages. Following the hearing, judgment against Affiliated was entered in the amount of $189,164.43. This appeal followed.
 
 II.
 A.
 
 13
 As an initial matter, Hydro-Dyne asserts that Affiliated's notice of appeal was not timely filed and that, consequently, this court is without jurisdiction to entertain it. Although the district court entered an order fixing liability between Hydro-Dyne and Affiliated on December 7, 1984, the order awarding damages was not entered until June 14, 1985. Affiliated filed its notice of appeal on July 11, 1985.
 
 
 14
 A summary judgment determining liability of the parties but reserving determination of damages is not a final judgment. Fed.R.Civ.P. 56(c). See, e.g., Liberty Mutual Insurance Co. v. Wetzel, 424 U.S. 737, 744 (1976); General Television Arts, Inc. v. Southern Railway Co., 725 F.2d 1327, 1331 (11th Cir.1984); R.J. Wolf v. Banco Nacional de Mexico, S.A., 721 F.2d 660, 662 (9th Cir.1983). See generally, 10A, C. Wright, A. Miller and M. Kane, Federal Practice and Procedure Sec. 2736, at 453 (1983). Therefore, the final judgment in this case was not entered until June 14, 1985. Affiliated's notice of appeal was timely filed under Fed.R.App.P. 4(a), and this court has jurisdiction to entertain it.
 
 B.
 
 15
 Affiliated argues that the district court erred in granting summary judgment as to liability in favor of Hydro-Dyne.[1] The relationship between Affiliated and Hydro-Dyne was governed by two substantially identical shop inspection service agreements. The agreement governing their relationship at the time the pressure vessels in question were certified became effective on February 1, 1980. Paragraph 1 of the agreement provides that "[t]he design, material and workmanship shall comply with the requirements of the applicable A.S.M.E. Boiler and Pressure Vessel Code and the existing regulations in the locality where the Object will be installed and used." Joint Appendix at 40.
 
 
 16
 Paragraph 2 of the agreement provided that Hydro-Dyne would assume "[f]ull responsibility ... for compliance of each Object manufactured by him with the A.S.M.E. requirements or local regulations as respects design, material, construction, workmanship, testing and stamping." Id. Paragraph 5 of the agreement provided that Affiliated "shall provide such inspections and services as are necessary to conform to the applicable A.S.M.E. Code, the requirements of the National Board of Boiler and Pressure Vessel Inspectors, and applicable local laws." Id. Finally, Paragraph 10 of the agreement contained an indemnification clause which provided:
 
 
 17
 The Manufacturer [Hydro-Dyne] agrees to hold the Company [Affiliated] harmless from any liability to the Manufacturer or to others for bodily injury or property damage, including loss of earnings or profits caused by or in any way connected with the services to be performed hereunder, or the omission of any such services, or arising out of any defect in or accident to property of the Manufacturer or of others.
 
 
 18
 Joint Appendix at 41.
 
 
 19
 Additional evidence concerning the relationship between Hydro-Dyne and Affiliated is provided by the manufacturer's data report which was prepared for each pressure vessel prior to the inspection. Each data report contained a certificate of compliance which was signed by a representative of Hydro-Dyne. The certificate of compliance provided: "We certify that the statements made in this report are correct and that all details of design, material, construction, and workmanship of this vessel conform to the ASME Code for Pressure Vessels, Section VIII, Division 1." Joint Appendix at 47. Each data report also contained a certificate of shop inspection, which was signed by Affiliated's inspector. By signing this certificate, the inspector certified that:
 
 
 20
 to the best of my knowledge and belief, the Manufacturer has constructed this pressure vessel in accordance with ASME Code, Section VIII, Division 1.
 
 
 21
 By signing this certificate neither the inspector nor his employer makes any warranty, expressed or implied, concerning the pressure vessel described in the Manufacturers' Data Report. Furthermore, neither the inspector nor his employer shall be liable in any manner for any personal injury or property damage or a loss of any kind arising from or connected with this inspection.
 
 
 22
 Id.
 
 
 23
 Affiliated contends that, in accordance with these contractual provisions, Hydro-Dyne assumed all responsibility for insuring that the pressure vessels in question complied with the requirements of the ASME Code. Moreover, Affiliated contends that the indemnity provision contained in Paragraph 10 of the shop inspection service agreement requires Hydro-Dyne to indemnify Affiliated for the amount expended to settle Ecodyne's claim against Affiliated. The district court rejected this argument, concluding that:
 
 
 24
 [a] fair interpretation of these conditions is that while Hydro-Dyne is ultimately responsible for building pressure vessels which will conform to the ASME code, it is [Affiliated's] function to certify that the pressure vessels have met the code requirements in effect where they will be installed. If the inspection indicates that the pressure vessels do not meet these requirements, Hydro-Dyne would be liable for any damages arising out of its contract with a third party, such as Ecodyne in this case.
 
 
 25
 The only reason Hydro-Dyne contracted with [Affiliated] was to conduct independent inspections of the goods it fabricated. [Affiliated], as an authorized inspector, had specific expertise in the field and as such, its approval of a pressure vessel pursuant to contract was capable of reliance. In this case, [Affiliated] approved and certified the pressure vessels fabricated for Ecodyne. All parties rightfully relied on that approval. By certifying that the vessels met ASME requirements when they did not, [Affiliated] breached the first condition of its contract with Hydro-Dyne. They are thus liable for all damages arising naturally from that breach.
 
 
 26
 Joint Appendix at 144-45.
 
 
 27
 To support its conclusion that Affiliated was liable for all damages resulting from the breach of the shop inspection service agreement, the district court relied on Grace & Co. v. Pittsburgh Testing Laboratory, 249 F.2d 165 (9th Cir.1957). In Grace & Co., the plaintiff contracted with the Government of New Zealand to supply steel billets. However, as the plaintiff was not in the manufacturing business, it hired Seattle Foundry to manufacture the billets, and because the plaintiff did not possess sufficient expertise to insure that the billets complied with contract specifications, it hired Pittsburgh Testing, which did possess such expertise, to provide inspection services.
 
 
 28
 Pittsburgh Testing certified the billets, even though they did not conform to contract specifications. As a result, the plaintiff incurred liability on its contract with the Government of New Zealand. The court concluded that Pittsburgh Testing was liable for the damages incurred by Grace.
 
 
 29
 The purpose of Grace in employing Pittsburgh was to insure the delivery of the material described in its contract with New Zealand. It relied, and had a right to rely, on Pittsburgh performing that service. Had Pittsburgh called the attention of Grace to the fact that the material being furnished by Foundry did not meet the specification which Grace had informed Pittsburgh it was supposed to get, then from that moment on Grace would have been in a position to either cancel its contract with Foundry or take other appropriate action to minimize its loss.
 
 
 30
 Id. at 167-68.
 
 
 31
 We agree with the district court's conclusion that Affiliated breached its contract with Hydro-Dyne. Paragraph 1 of the shop inspection service agreement requires Affiliated to provide shop inspection services subject to the condition that the pressure vessels will conform to the requirements of the ASME Code. By certifying that the pressure vessels conformed with the code when in fact they did not, Affiliated breached this condition and is liable for damages resulting from the breach. See Grace & Co., 249 F.2d at 168; Markowitz & Co. v. Toledo Metropolitan Housing Authority, 608 F.2d 699 (6th Cir.1979) (applying Ohio law).
 
 
 32
 Affiliated seeks to support its claim that it did not breach the contract by arguing that Hydro-Dyne retained its own in-house inspectors to insure compliance with the code and that they had the ultimate responsibility for insuring that code requirements were met. Specifically, Affiliated objects to the district court's finding that:
 
 
 33
 Hydro-Dyne could only sign off on this report [the manufacturer's data report] after the inspection and approval of an authorized ASME inspector, a requirement for installation. Even though Hydro-Dyne employed persons who could inspect the vessels during each stage of fabrication, it is the final approval of an authorized inspector which assures all parties that the vessels meet the ASME Code.
 
 
 34
 Joint Appendix at 145-46.
 
 
 35
 Although it is unclear whether Hydro-Dyne could have signed the certification without the approval of Affiliated inspectors, it is clear that the signature of Affiliated's inspector was a prerequisite to installation of the pressure vessels. If Affiliated had not approved the vessels, they never would have been shipped to Ecodyne. We therefore agree with the district court's conclusion that Affiliated breached its contract with Hydro-Dyne by certifying the defective pressure vessels.
 
 C.
 
 36
 Having concluded that Affiliated breached its contract with Hydro-Dyne, we must now consider whether Paragraph 10 of the shop inspection service agreement relieved Affiliated from liability for damages incurred as a result of the breach. As noted above, Paragraph 10 contains a provision whereby Hydro-Dyne agrees to hold Affiliated harmless from any liability to Hydro-Dyne or third parties for bodily injury or property damage resulting from the performance of the inspection services. We must determine whether this provision is sufficiently broad to relieve Affiliated of its liability to Hydro-Dyne for breach of contract, and whether it is sufficiently broad to require Hydro-Dyne to indemnify Affiliated for the amount Affiliated expended in settling its dispute with Ecodyne, which was based upon Ecodyne's reliance on Affiliated's negligent inspections. The legal standards for evaluating the provision in light of both claims is the same. See Bowman v. Davis, 48 Ohio St.2d 41, ---, 356 N.E.2d 496, 498 (1976) (per curiam) (applying rules of construction for indemnity agreements to a case involving a waiver of liability); Hine v. Dayton Speedway Corp., 20 Ohio App.2d 185, ---, 252 N.E.2d 648, 652 (1969) (applying rules of construction for indemnity provisions to a release).
 
 
 37
 Initially, we note that the interpretation of state law provided by a district judge in a diversity case is entitled to "considerable weight."
 
 
 38
 As we have often stated, "[w]hen this court is reviewing a district judge's interpretation of state law, we give 'considerable weight' to the interpretation of the judge." Bagwell v. Canal Insurance Co., 663 F.2d 710, 712 (6th Cir.1981). Accordingly, "if a federal district judge has reached a permissible conclusion upon a question of local law, the Court of Appeals should not reverse even though it may think the law should be otherwise." Insurance Co. of North America v. Federated Mutual Insurance Co., 518 F.2d 101, 106 n. 3 (6th Cir.1975) (quoting Rudd-Melikian, Inc. v. Merritt, 282 F.2d 924, 929 (6th Cir.1960)).
 
 
 39
 Martin v. Joseph Harris Co., Inc., 767 F.2d 296, 299 (6th Cir.1985); see Wright v. Holbrook, 794 F.2d 1152 (6th Cir.1986). In the present case, the district court held that the contractual indemnity provision does not cover the damages sustained as a result of the erroneous certification of pressure vessels. For the following reasons, we conclude that his interpretation was correct.
 
 
 40
 In construing contractual indemnity provisions, Ohio courts have utilized the familiar principle of ejusdem generis, which requires words of general import to be limited by specific terms preceding them. In the seminal case of The George H. Dingledy Lumber Co. v. Erie R. Co., 102 Ohio St. 236, 131 N.E. 723 (1921), the Ohio Supreme Court discussed the application of ejusdem generis in the context of an indemnity agreement. In Dingledy Lumber, the following indemnity provision was contained in the lease between the parties:
 
 
 41
 "Said lessee for itself, its successors and assigns, hereby assumes all risk of loss, damage or injury, by fire or otherwise, to person or property on or about said leased premises, and all risk of loss by fire to property of said lessee, or in which it may be interested, on any neighboring premises owned or occupied by said lessee to which fire shall be communicated from the leased premises, arising out of the condition or location of said leased premises, or the operation, maintenance or existence of the railroad operated by said lessor, its successors or assigns, or any of its appurtenances, and agrees to indemnify and save harmless said lessor, its successors and assigns, from all claims for any and all such loss, damage or injury, whether caused by the negligence of the said lessors, its successors or assigns, or by the negligence of its or their servants, agents or employes [sic], or otherwise."
 
 
 42
 Id. at 237-38, 131 N.E. at 723.
 
 
 43
 The plaintiff in Dingledy Lumber argued that the phrase "injury, by fire or otherwise," was sufficiently broad to encompass injury resulting from the negligent operation of a railroad. The court disagreed.
 
 
 44
 It is clear that the parties did intend that the indemnification agreement should cover loss or damage by fire. That purpose is plainly expressed by the contract. It is not clear what other causes of loss or damage were contemplated. The principle of construction known as ejusdem generis therefore should be applied in determining what is included in the term "by fire or otherwise." The application of that rule would require that, where an enumeration of specific things is followed by some more general word or phrase, such general word or phrase should be held to include only things of the same general nature as those specified.
 
 
 45
 Id. at 245, 131 N.E. at 725-26.
 
 
 46
 The principle was also applied in Kay v. Pennsylvania R. Co., 156 Ohio St. 503, 103 N.E.2d 751 (1956), in which the Supreme Court construed a contract providing indemnity for damages resulting from the operation and maintenance of an unloading machine. The provision stated that
 
 
 47
 "The second party agrees to indemnify, protect and save harmless the first party, its successors and assigns, from all liens, actions, costs, loss and damage growing out of or resulting from injuries to persons or damage to property which may arise or result from the location, maintenance and operation of the said unloading machine and appurtenances or other buildings, structures or fixtures, by the said second party or any other person or persons in its behalf, regardless of whether or not the negligence of the servants, agents and employees of the first party caused or contributed to such injury to persons or damage to property." (Italics supplied.)
 
 
 48
 Id. at 507, 103 N.E.2d at 753-54. The court concluded that the "contract relates specifically to an unloading machine and ... the general terms 'appurtenances or other buildings, structures or fixtures' refer only to things related to an unloading machine." Id. at 508, 103 N.E.2d at 754. Consequently, the court held that the contract did not provide indemnity for the negligent operation of a drawbridge.
 
 
 49
 In a more recent case, this court applied the principle of ejusdem generis to an indemnity provision governed by Ohio law. See Bahamas Agricultural Industries Ltd. v. Riley Stoker Corp., 526 F.2d 1174 (6th Cir.1975). There the following indemnity provision was in issue:
 
 
 50
 As our [Bailey Meter's] representatives are authorized to act only in a consulting capacity and are not authorized or licensed to operate equipment, all responsibility for operation rests with the Purchaser. Bailey Meter Company shall not be liable for any claims, losses, labor, expenses or damages, direct or consequential, resulting directly or indirectly from the service performed, or for other consequential loss or damage of any nature arising from any cause.
 
 
 51
 Id. at 1179. We held that, under Ohio law, this language was insufficiently broad to relieve the indemnitee from liability for its own negligence. Id. Moreover, we concluded:
 
 
 52
 [T]he provision is not clear and unequivocal in another respect. Although Bailey Meter contends that the provision is sufficient to relieve it from liability for loss or damage resulting from "any cause," this general phrase is limited in its scope by the more specific terminology which precedes it.... Thus the limitation of liability arguably could extend only to damage resulting from Bailey Meter's operation of the boiler.
 
 
 53
 Id. (citations omitted). This court resolved the ambiguity against the indemnitee, and thus concluded that a jury question was presented as to whether Bailey Meter's employee was negligent other than by reason of operation of the boiler. Id.
 
 
 54
 The foregoing analysis supports the district court's conclusion that the indemnity provision in paragraph 10 of the shop inspection service agreement does not extend to the damages sustained in the present case. We agree that the provision
 
 
 55
 does extend to liability for bodily injury or property damage occurring in relation to the inspected vessels, that is not the case here. Although the clause is written broadly so as to cover as much as possible, it does not unequivocally cover [Affiliated] for the improper and erroneous certification of pressure vessels.
 
 
 56
 Joint Appendix at 147-48.
 
 
 57
 This result is entirely consistent with the general rule that, under Ohio law, "[c]ontracts of indemnity purporting to relieve one from the results of his failure to exercise ordinary care ... must be strictly construed and express the intent to indemnify in clear and unequivocal terms." General Accident Fire & Life Assurance Corp., Ltd. v. Smith & Oby Co., 272 F.2d 581, 583 (6th Cir.1959). An "indemnity agreement must be strictly construed and any ambiguity must be decided against the indemnitee." Linkowski v. General Tire & Rubber Co., 53 Ohio App.2d 56, 62, 371 N.E.2d 553, 556-57 (1977). See, e.g.. Freed v. Great Atlantic & Pacific Tea Co., 401 F.2d 266, 269-70 (6th Cir.1968); Mead Corp. v. Allendale Mutual Insurance Co., 465 F.Supp. 355, 362-63 (N.D.Ohio 1979); National Surety Corp. v. Erskine & Sons, Inc., 188 F.Supp. 687, 688 (N.D.Ohio 1960); Bowman, 48 Ohio St.2d at 44, 356 N.E.2d at 498; Kay, 156 Ohio St. at 505, 103 N.E.2d at 752-53; Massachusetts Bonding & Insurance Co. v. Westinghouse Electric & Manufacturing Co., 72 N.E.2d 388, --- (Ohio App.1946); Zurich General Accident & Liability Insurance Co. v. Liberman, 71 N.E.2d 281, 284 (Ct.Common Pleas 1947).
 
 
 58
 Although the general rule is well-established, its application to a given contractual provision is highly fact-specific. "It must be borne in mind that we are applying a principle of law to a set of facts. The principle of law does not change, but the facts are rarely ever the same.... Each case must stand on its own facts." Smith & Oby Co., 272 F.2d at 584.
 
 
 59
 Analysis of Ohio law indicates that indemnity provisions must contain broad, all-encompassing language in order to relieve a party from its own negligence. For example, in St. Paul Mercury Indemnity Co. v. Kopp, 121 N.E.2d 23 (Ohio App.1954), the contractor agreed
 
 
 60
 to indemnify and save harmless Principal from any and all loss, cost, damage, or expense to persons or property, including injury or death suffered by persons employed by said contractor or members of the public, growing out of or in any way connected with the performance of the work awarded to contractor.
 
 
 61
 Id. at ---. The court held that this provision was sufficiently broad to encompass personal injury caused by the indemnitee's negligence. Such broad language has been construed to provide indemnity from negligence in other cases decided under Ohio law. See, e.g., Smith & Oby Co., 272 F.2d at 583, 585; D'Onofrio v. Sun Oil Co., 277 F.2d 543, 544 (6th Cir.1960) (clause covering "any and all claims growing out of any injury to any person or any property ... caused in any way ..." was sufficiently broad to encompass personal injury caused by indemnitee's negligence); Brookridge Party Center, Inc. v. Fisher Foods, Inc., 12 Ohio App.3d 130, ---, 468 N.E.2d 63, 68 (1983); Hine, 20 Ohio App.2d at ---, 252 N.E.2d at 652; Central National Bank v. Gallagher, 13 Ohio App.2d 115, ---, 234 N.E.2d 524, 530 (1968); Dayton Fabricated Steel Co. v. Dayton Town & Country, Inc., 99 Ohio App. 309, 133 N.E.2d 423 (1954).
 
 
 62
 Ohio law is equally clear that limitations in an indemnity provision will be given effect. Thus, in Standard Accident Insurance Co. v. National Fire Proofing Co., 39 Ohio App. 1, 176 N.E. 591 (1931), the subcontractor agreed to indemnify the owner and contractor for "all loss or damage ... on account of any claim, demand or suit made or brought against the Owner and/or Contractor by or on behalf of any employee of the Sub-Contractor, or by or on behalf of any person injured by the Sub-Contractor, his servants, agents or employees." Id. at ---, 176 N.E. at 593. The court held that this provision did not encompass a wrongful death claim.
 
 
 63
 It will be noted that the indemnity provided extends to claims made "by or on behalf of any employee of the subcontractor." The claim in this case was made by reason of the death of an employee of the subcontractor, but it was not made by or on his behalf. The plaintiffs are held to the strict limits of the language employed in the contract under consideration, and it is not broad enough to include an action for wrongful death, because such action is not brought by or on behalf of any employee of the subcontractor.
 
 
 64
 Id. at ---, 176 N.E. at 593. Similarly, in Zurich General Accident & Liability Insurance Co. v. Liberman, 71 N.E.2d 281 (Ct.Common Pleas 1947), the terms of an indemnity provision were strictly construed to exclude liability for damage occurring in a manner different from that explicitly provided in the contract.
 
 
 65
 Thus, if we construe the language in paragraph 10 of the shop inspection service agreement strictly against Affiliated, we must conclude that the provision covers only damages arising from bodily injury or property damage. The provision is insufficiently broad to cover damages sustained in the present case as a result of Affiliated's erroneous certification of the pressure vessels. Moreover, as earlier stated, this was the construction given to the indemnity provision by the district court, and it is well settled that the interpretation of state law provided by a district judge in a diversity case is entitled to "considerable weight."
 
 III.
 
 66
 Accordingly, for the reasons stated, the judgment of the district court if AFFIRMED.
 
 
 67
 BOGGS, Circuit Judge, dissenting.
 
 
 68
 This case is one of simple contract interpretation, where the parties' intent is clearly recorded in their chosen language. The court's opinion provides no sound reason for refusing to honor this language, so I respectfully dissent.
 
 
 69
 There is no question that both parties breached the contract. Hydro-Dyne was supposed to make conforming pressure vessels. Affiliated was supposed to inspect the vessels properly. They both failed. The question is: How should losses caused by this mutual failure be allocated? This is not a case where upholding an indemnity contract will deprive an injured party of redress from a deep-pockets defendant. The damaged party has been made whole. The only question is how a loss will be allocated between the manufacturer and the inspector.
 
 
 70
 The parties allocated the risk of loss between themselves quite clearly in the contract. Hydro-Dyne accepted the risk of loss when it accepted the indemnification provision found in Clause 10 of the Shop Inspection Service Agreement:
 
 
 71
 The Manufacturer [Hydro-Dyne] agrees to hold the Company [Affiliated] harmless from any liability to the Manufacturer or to others for bodily injury or property damage, including loss of earnings or profits caused by or in any way connected with the services to be performed hereunder, or the omission of any such services, or arising out of any defect in or accident to property of the Manufacturer or of others.
 
 
 72
 Thus, the clause concerns a type of liability ("bodily injury or property damage ...") and a cause of liability ("caused by or in any way connected with the services ... or the omission ... or arising out of any defect ...").
 
 
 73
 The plain language of the clause covers the situation here. The loss was caused by two things: Hydro-Dyne's manufacture of the defective pressure vessels and Affiliated's erroneous certification. A straightforward reading of the indemnification clause shows that Hydro-Dyne agreed to take the risk of Affiliated's erroneous certification when it agreed to the broad description of covered causes, indemnifying Affiliated against liability caused by or in any way connected with the performance or omission of contract services.
 
 
 74
 The district court, however, found that the clause did not relieve Affiliated of liability for negligent inspection, stating:
 
 
 75
 The indemnification clause in the agreement before this court is not so clear as to relieve [Affiliated] of the effects of its failure to exercise ordinary care in certifying that the pressure vessels met ASME requirements. While it does extend to liability for bodily injury or property damage occurring in relation to the inspected vessels, that is not the case here. Although the clause is written broadly so as to cover as much as possible, it does not unequivocally cover [Affiliated] for the improper and erroneous certification of pressure vessels.
 
 
 76
 Joint Appendix at 147-48. On page 19 of its opinion, this court approves of the district court's analysis and on page 23 concludes that the clause covers only damages arising from bodily injury or property damage and not from erroneous certification.[1]
 
 
 77
 I find this interpretation of the indemnification clause to be faulty in several ways. First, it is a simple misreading of the plain language of the clause. Though cryptic, the district court does not appear to contest that this case involves the type of liability covered by the clause. Rather, it seems to say that erroneous certification is not the kind of cause that is covered. Yet the cause language is meant to be inclusive, not exclusive. It covers liability "in any way connected" with the contract services. That phrasing is certainly broad enough to cover erroneous certification. Similarly, this court's opinion misspeaks in referring to damage "arising from bodily injury or property damage." Those terms refer to the type of liability covered, not the causation.
 
 
 78
 Second, the court's interpretation upsets the risk allocation the parties themselves had arranged. This was a contract for inspection, not insurance. The indemnification clause makes clear that Affiliated contracted only to perform an inspection and certify the vessels if they met ASME standards. It did not undertake to insure Hydro-Dyne against its manufacturing defects, or against errors in the inspection. Had it chosen to do so, it would no doubt have required a higher payment or other contract considerations. When courts intervene and allocate liability differently than the parties' initial bargain, they place at considerable jeopardy the proper conduct of economic affairs.
 
 
 79
 Third, the court's analysis impels parties toward an impossibly technical and detailed contractual style in hopes that their intentions will be honored by the courts. The district court's interpretation that "the clause is written broadly so as to cover as much as possible, [but] does not unequivocally cover ... the improper and erroneous certification of pressure vessels" is the type of "purple elephant" analysis which tends to bring legal language into disrepute. A decision that protection from "bodily injury" doesn't include "being trampled by a herd of purple elephants" compels lawyers to engage in the type of triple-plating and copper-bottoming that make legal language a parody of itself. The better interpretation is that the clause is indeed written broadly and does cover as much as possible, or at least as much as any reasonable interpretation would give it, which includes the issue at hand.
 
 
 80
 Nor do I believe the court's result is compelled by Ohio law. As the court indicates, contracts of indemnity, even for negligence, are not contrary to Ohio public policy. General Accident Fire and Life Assurance Corporation, Ltd. v. Smith and Oby Co., 272 F.2d 581 (6th Cir.1959). These contracts must be strictly construed and express the intent to indemnify in clear and unequivocal terms. Id. at 583; George H. Dingledy Lumber Co. v. Erie Railroad Co., 102 Ohio St. 236, 131 N.E. 723 (1921); Kay v. Pennsylvania R. Co., 156 Ohio St. 503, 103 N.E.2d 751 (1952). However, it is not necessary to use the word negligence to express the intent to indemnify for negligence. Dingledy Lumber, 131 N.E.2d 723; Central National Bank of Cleveland v. Gallagher, 13 Ohio App.2d 115, 234 N.E.2d 524 (1968); St. Paul Mercury Indemnity Co. v. Kopp, 121 N.E.2d 23 (Ohio App.1954); D'Onofrio v. Sun Oil Co., 277 F.2d 543 (6th Cir.1960); Smith and Oby, 272 F.2d 581.
 
 
 81
 The majority is correct that Ohio courts have construed indemnification clauses strictly by using the familiar principle of ejusdem generis, limiting words of general import by specific terms preceding them, to exclude certain types of damage not clearly covered by the clause in question. See Dingledy Lumber, 102 Ohio St. at 245, 131 N.E. at 725-26 (risk of loss "by fire or otherwise" limited to fire damage); Kay, 156 Ohio St. at 508, 103 N.E.2d at 753-54 (loss resulting from operation of "unloading machine and appurtenances or other buildings, structures or fixtures" covers only structures related to an unloading machine).
 
 
 82
 The ejusdem generis principle, however, is simply not applicable to the indemnification clause in the contract before us. The clause is not limited by its terms to a certain type of damage or to loss arising from a specific source as were the clauses in the cases above. Rather the clause covers any liability for bodily injury or property damage in any way connected with the contract services. The Ohio courts have never used the ejusdem generis principle to make a blanket exclusion of negligence as the court seems to do here.
 
 
 83
 Ohio courts have consistently held that language indemnifying against any damage arising from the contract is broad enough to cover negligence without an explicit reference to negligence in the clause itself. See Brookridge Party Center v. Fisher Foods, Inc., 12 Ohio App.3d 130, 468 N.E.2d 63 (1983); Hine v. Dayton Speedway Corp., 20 Ohio App.2d 185, 252 N.E.2d 648 (1969); Central National Bank of Cleveland v. Gallagher, 13 Ohio App. 115, 234 N.E.2d 524 (1968); Dayton Fabricated Steel Co. v. Dayton Town and Country, Inc., 99 Ohio App. 309, 133 N.E.2d 423 (1954); St. Paul Mercury Indemnity Co. v. Kopp, 121 N.E.2d 23 (Ohio App.1954). But see Massachusetts Bonding and Insurance Co. v. Westinghouse Electric and Manufacturing Co., 72 N.E.2d 388 (Ohio App.1946). The 6th Circuit has even recognized that Ohio law does not require use of the word negligence, for "then it might be open to the question that it was limited to liability only for negligence." Smith and Oby, 272 F.2d at 585.
 
 
 84
 The most recent Ohio case on point, Brookridge Party Center, 468 N.E.2d 63 (1983), analyzes the business reasons behind indemnity clauses:
 
 
 85
 Further, indemnity agreements are becoming commonplace for numerous commercial transactions, including commercial leases. Such agreements serve a function similar to fire loss provisions. They seek to assign anticipatable risks of loss to one or both parties, for commercial convenience in allocating transaction costs. The party who accepts a risk can then obtain insurance protection against that potential loss, or undertake the status of a self-insurer.
 
 
 86
 Id. at 68. The court presumed that the parties had allocated the risk of all reasonably foreseeable liability under the contract, including the risk of one party's negligence.
 
 
 87
 Affiliated was in the business of certifying things. It was concerned that it might occasionally certify such things erroneously or improperly. Therefore, it wrote a clause which, fairly read (or even strictly read), protects it from liability for damages arising from exactly the type of error that occurred here involving exactly the kinds of things it inspects, namely, in this case, pressure vessels. To adopt the district court's strained interpretation here would be to interpret Ohio law to in fact exclude all indemnity contracts, despite the explicit statement that such contracts may be made, where clearly written.
 
 
 88
 If this clause is inadequate, we would be interpreting the pronouncements of Ohio law permitting indemnity to be as unreliable as those which Macbeth found to:
 
 
 89
 palter with us in a double sense; that keep the word of promise to our ear, and break it to our hope.[2]
 
 
 90
 I believe we should keep the word of promise of the Ohio courts here and hold that ordinary language, reasonably construed, can support a freely chosen allocation of risk between two parties.
 
 
 
 [1]
 In the proceedings between Hydro-Dyne and Ecodyne, the district court awarded Ecodyne $175,000.00 in damages for repair of the pressure vessels, $44,836.80 in delay damages, and $4,200.71 in incidental damages. In the subsequent proceedings between Affiliated and Hydro-Dyne, Affiliated argued that its liability should be limited to 75 per cent of each element of damages because only 75 per cent of the equipment was required to comply with the ASME Code. The district court rejected this contention on the ground that the improper certification deprived Hydro-Dyne of the opportunity to repair the vessels in Ohio; because the repairs were made in Maine, the officials there required the vessels to meet higher standards. The district court's computation of damages is not challenged in this appeal
 
 
 [1]
 The court chooses to follow the district court's interpretation, saying that state law interpretation by a district judge in a diversity case is entitled to "considerable weight." The court cites a series of cases holding that "if a federal district judge has reached a permissible conclusion upon a question of local law, the Court of Appeals should not reverse even though it may think the law should be otherwise." Martin v. Joseph Harris Co., Inc., 767 F.2d 296, 299 (6th Cir.1985). However, the "appellants 'are entitled to review of state law just as they are of any other legal question.' " Randolph v. New England Mutual Life Insurance Co., 526 F.2d 1383, 1385 (6th Cir.1975). Furthermore, this deference to the district court's interpretation is only proper "where the local law is uncertain under state court rulings," Rudd-Melikian, Inc. v. Merritt, 282 F.2d 924, 929 (6th Cir.1960); Insurance Company of North America v. Federated Mutual Insurance Company, 518 F.2d 101, 106 (6th Cir.1975), or where there is an "absence of 'reported [state] decision[s] on the precise issue involved." Randolph, 526 F.2d at 1385; Wright v. Holbrook, 794 F.2d 1152 (6th Cir.1986). Such is not the case here. As detailed below, there is ample state law on the precise issue in question. In light of Ohio law clearly holding that indemnity clauses can be construed to cover negligence without explicitly using the word, the district court's strained interpretation is not "a permissible conclusion."
 
 
 [2]
 William Shakespeare, Macbeth, Act V, Scene vii, 49-51