**Duane MARTIN and Robert Rick, Plaintiffs-Appellees,**

v.

**The JOSEPH HARRIS CO., INC., a foreign corporation, Defendant-Appellant.**

**No. 84–1416.**

United States Court of Appeals, Sixth Circuit.

Argued April 16, 1985.

Decided July 15, 1985.

Merritt, Circuit Judge, filed concurring opinion.

Kenneth L. Block, Grand Rapids, Mich., William D. Buchanan, Clark C. King, Jr., Lord, Bissell, & Brook, Chicago, Ill., and Keith D. Parr, argued, for defendant-appellant.

Richard A. Kay, argued, and Myra L. Willis, Varnum, Riddering, Schmidt & Howlet, Grand Rapids, Mich., for plaintiffs-appellees.

Before MERRITT and MILBURN, Circuit Judges, and GUY, District Judge.*

MILBURN, Circuit Judge.

The defendant, Joseph Harris Co., Inc., brings this appeal following the district

---

* The Honorable Ralph B. Guy, Jr., Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

court's granting the plaintiffs' motion for a judgment not withstanding the verdict and a second trial in plaintiffs' action for damages as a result of defective seeds. Because we hold that the district court was correct in holding that, under the facts of this case, the disclaimer of warranty and limitation of remedy clause used by the defendant was unconscionable under Michigan law, and because we further hold that the district court properly held that the implied warranty of merchantability was breached as a matter of law, we affirm.

## I.

Plaintiffs Duane Martin and Robert Rick ("Martin and Rick") were commercial farmers in Michigan. In August of 1972, Martin and Rick placed independent orders for cabbage seed with the defendant, Joseph Harris Co., Inc. ("Harris Seed"), a national producer and distributor of seed. Plaintiffs had been customers of Harris Seed for several years and, as in earlier transactions, the order form supplied by Harris Seed included a clause disclaiming the implied warranty of merchantability and limiting buyers' remedies to the purchase price of the seed.[1] A similar clause was also used by Harris Seed's competitors for the same purpose. Neither of the plaintiffs read the clause nor did the salesman make any attempt either to point it out or to explain its purpose.

Three to four months after placing their orders, plaintiffs received Harris Seed's 1973 Commercial Vegetable Growers Catalog. Included in the lower right-hand corner of one page of the catalog was a notification that Harris Seed would no longer "hot water" treat cabbage seed. Hot water treatment had successfully been used since 1947 to eradicate a fungus known as *phoma lingam* or "black leg," a seed borne disease that causes affected plants to rot before maturing.[2]

Plaintiffs planted their cabbage crop in April and May of 1973, using, among other seed, that supplied by Harris Seed. In mid-July, Harris Seed notified plaintiffs that the seed lot used to fill plaintiffs' order was infected with black leg. Although plaintiffs attempted to minimize the effect of the disease, large portions of their cabbage crops were destroyed. However, in marketing their smaller than usual crop, both plaintiffs made a profit equal to or higher than previous years. This unusual profit margin was due to the rise in market price for cabbage in 1973, which in turn was affected in part by the fact that the 1973 black leg epidemic reduced the amount of available cabbage.

On August 5, 1975, plaintiffs brought this action. After a hearing on the enforceability of the disclaimer of warranty and limitation of liability clause, the district court ruled that the clause was unconscionable and, therefore, unenforceable. A jury was impaneled to try plaintiffs' legal liability theories of negligence and breach of implied warranty. Following a six-day trial the jury returned a verdict against plaintiffs on both theories; however, the district court granted the plaintiffs' motion for a j.n.o.v. on the implied warranty issue. A second jury impaneled to hear the issue of damages returned verdicts in favor of Martin in the amount of Thirty-six Thousand ($36,000.00) Dollars and in favor of Rick in

---

1. The disclaimer of warranties and exclusion of remedies clause, which was printed in the order form, seed catalogs and on the seed packages, appeared as follows:

 NOTICE TO BUYER: Joseph Harris Company, Inc. warrants that seeds and plants it sells conform to the label descriptions as required by Federal and State seed laws. IT MAKES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR PURPOSE, OR OTHERWISE, AND IN ANY EVENT ITS LIABILITY FOR BREACH OF ANY WARRANTY OR CON-

TRACT WITH RESPECT TO SUCH SEEDS OR PLANTS IS LIMITED TO THE PURCHASE PRICE OF SUCH SEEDS OR PLANTS. No question has been raised as to whether this clause complies with the requirements of Mich. Comp.Laws Ann. § 440.2316 (U.C.C. § 2–316).

2. According to testimony at trial, the only black leg epidemic between 1947 and 1973 was in 1966, and was traced to cabbage seed imported from Australia. The 1947 and the 1973 black leg was traced to State of Washington produced cabbage seed.

the amount of Sixteen Thousand ($16,-000.00) Dollars.

## II.

Our review of the district court's rulings in this diversity case is controlled by the State of Michigan's version of the Uniform Commercial Code, Mich.Comp.Laws Ann. § 440.1101 *et seq.*[3] As we have often stated, "[w]hen this court is reviewing a district judge's interpretation of state law, we give 'considerable weight' to the interpretation of the judge." *Bagwell v. Canal Insurance Co.*, 663 F.2d 710, 712 (6th Cir. 1981). Accordingly, "if a federal district judge has reached a permissible conclusion upon a question of local law, the Court of Appeals should not reverse even though it may think the law should be otherwise." *Insurance Co. of North America v. Federated Mutual Insurance Co.*, 518 F.2d 101, 106 n. 3 (6th Cir.1975) (quoting *Rudd-Melikian, Inc. v. Merritt*, 282 F.2d 924, 929 (6th Cir.1960)).

## A.

■ The first issue raised by Harris Seed is whether the district court erred in holding the disclaimer and limitation clause unconscionable under U.C.C. § 2–302. The question of the unconscionability of a contract clause is one of law for the court to decide in light of "its commercial setting, purpose and effect." U.C.C. § 2–302. Since the Code does not define unconscionability, the district court reviewed case law to aid it in its resolution of this question.

■ A threshhold problem in this context is whether under Michigan law warranty disclaimers which comply with U.C.C. § 2–316 are limited by U.C.C. § 2–302. In holding Harris Seed's disclaimer clause unconscionable under the facts of this case, the district court implicitly held that U.C.C. § 2–302 is a limitation on U.C.C. § 2–316. Harris Seed argues that by enacting § 2–316 the Michigan Legislature "unequivocally [authorized the] exclusion or modifica-

tion of the implied warranty of merchantability by disclaimer." We have been presented with no Michigan cases resolving this issue; however, a number of arguments support the district court's conclusion that § 2–316 is not insulated from review under § 2–302. First, § 2–302 provides that "any clause" of a contract may be found unconscionable. Similarly, "section 2–316 does not state expressly that all disclaimers meeting its requirements are immune from general policing provisions like section 2–302...." J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code*, § 12–11, at 476 (2d Ed.1980). Had the drafters of the Uniform Commercial Code or the Michigan Legislature chosen to limit the application of § 2–302, language expressly so stating could easily have been included. Furthermore, as pointed out by Professors White and Summers:

> Comment 1 [to § 2–302] lists and describes ten cases which are presumably intended to illustrate the underlying basis of the section: In seven of those cases disclaimers of warranty were denied full effect. It is difficult to reconcile the intent on the part of the draftsman to immunize disclaimers from the effect of 2–302 with the fact that they used cases in which courts struck down disclaimers to illustrate the concept of unconscionability.

*Id.* (footnotes omitted). Therefore, because this issue is unsettled under Michigan law and according the district court's conclusion "considerable weight," we hold that the district court correctly relied upon § 2–302 as a limitation on § 2–316.

We next turn to a more troublesome subissue; viz., whether within the special facts of this case the disclaimer and exclusionary clause was unconscionable under Michigan law. As has often been stated, commercial contracts will rarely be found unconscionable, *see, e.g., A & M Produce Co. v. FMC Corp.*, 135 Cal.App.3d 473, 186

---

**3.** Hereinafter we will only cite to the Uniform Commercial Code ("U.C.C." or "Code") section

numbers.

Cal.Rptr. 114 (1982), *Stanley A. Klopp, Inc. v. John Deere Co.*, 510 F.Supp. 807, 810 (E.D.Pa.1981), *aff'd*, 676 F.2d 688 (3rd Cir.1982),[4] because in the commercial setting the relationship is between business parties and is not so one-sided as to give one party the bargaining power to impose unconscionable terms on the other party.

In making its determination of unconscionability, the district court relied upon *Allen v. Michigan Bell Telephone*, 18 Mich.App. 632, 171 N.W.2d 689 (1969).[5] In *Allen* an insurance agent contracted with Michigan Bell Telephone Company to place advertisements in the classified telephone directory. When the advertisements were not included, he brought an action for damages. To defend the action, Michigan Bell Telephone Company relied on a limitation of remedies clause which, if upheld, would have limited the plaintiff's recovery to the contract price. In refusing to uphold the limitation, the Michigan court stated "the principle of freedom to contract does not carry a license to insert any provision in an agreement which a party deems advantageous." *Id.* at 691–92. Rather, the court stated that:

> [i]mplicit in the principle of freedom of contract is the concept that at the time of contracting each party has a realistic alternative to acceptance of the terms offered. Where goods and services can only be obtained from one source (or several sources on non-competitive terms) the choices of one who desires to purchase are limited to acceptance of the terms offered or doing without. Depending on the nature of the goods or services and the purchaser's needs, doing without may or may not be a realistic alternative. Where it is not, one who successfully exacts agreement to an unreasonable term cannot insist on the court's enforcing it on the ground that it was "freely" entered into, when it was not. . . .

> There are then two inquiries in a case such as this: (1) what is the relative bargaining power of the parties, their relative economic strength, the alternative sources of supply, in a word, what are their options?; (2) is the challenged term substantively reasonable?

*Id.* at 692.

 With reference to the test announced in *Allen*, Harris Seed argues that the relative bargaining power of the parties is not a proper consideration under § 2–302. This is an issue on which courts and commentators have taken varying approaches. *Compare, e.g., Phillips Machinery Co. v. LeBlond, Inc.*, 494 F.Supp. 318 (N.D.Okla.1980) (no requirement of equality of bargaining power, but rather must be some element of deception or substantive unfairness) *and Majors v. Kalo Laboratories, Inc.*, 407 F.Supp. 20, 23 (M.D.Ala.1975) ("[T]he Official Comment to

---

**4.** It is unclear whether the contract at issue is a commercial contract. As noted by the district court, some courts have held farmers and ranchers are not merchants. *See, e.g., Fear Ranches, Inc. v. Berry*, 470 F.2d 905 (10th Cir. 1972); *Cook Grains, Inc. v. Fallis*, 239 Ark. 962, 395 S.W.2d 555 (1965). Other courts have taken the opposite position and held farmers are merchants. *See, e.g., Campbell v. Yokel*, 20 Ill. App.2d 702, 313 N.E.2d 628 (1974); *Nelson v. Union Equity Co-Operative Exchange*, 548 S.W.2d 352 (Tex.1977). Although these cases deal with the definition of "merchant" in § 2–104 for purposes of application to § 2–201(2) (the "between merchants" exception to the statute of frauds), the inquiry is relevant here for purposes of determining whether the transaction at issue occurred in a true "commercial setting," where unconscionability is rarely found. However, since we hold that, even if considered a "commercial setting," the clause at issue was unconscionable under the facts of this case, we do not reach the issue.

**5.** Although it may be, as Harris Seed argues, that the criticisms of *Allen* by courts, *see, e.g., Robinson Insurance & Real Estate, Inc. v. Southwestern Bell*, 366 F.Supp. 307 (W.D.Ark.1973), and commentators, *see* J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code*, § 4–9, at 172 (2d Ed.1980) are well founded, the Michigan Appellate Court's holding is nevertheless an appropriate guide to our inquiry in the present case. *Cf. Simpson v. Jefferson Standard Life Insurance Co.*, 465 F.2d 1320, 1323 (6th Cir.1972) ("[d]ecisions of intermediate state courts must be followed by the federal courts unless there is reason to believe they would not be followed by the state's highest court.").

§ 2–302 suggests that [consideration of bargaining power] would be inappropriate.") *with Kerr-McGee Corp. v. Northern Utilities, Inc.,* 673 F.2d 323, 329 (10th Cir. 1982) (relative considerations include whether "there was a gross inequality of bargaining power.") *and* J. White & R. Summers, *supra,* § 12–11, at 477 ("[o]ne can argue that when a seller has such a strong bargaining position that he can impose a perfectly drafted disclaimer, which operates to deprive the buyer of virtually all protection that a law would otherwise provide, and he refuses to bargain at all concerning its scope, then that clause has become 'oppressive' and so 'one-sided' as to be unconscionable."). We agree with the district court that relative bargaining power is an appropriate consideration in determining unconscionability under the Michigan Uniform Commercial Code.

Other closely related factors suggested by the Michigan court in *Allen* for determining the presence of procedural unconscionability are the relative economic strength of the parties and the alternative sources of supply. With reference to the relative economic strength of the parties, we note that Harris Seed is a large national producer and distributor of seed, dealing here with independent, relatively small farmers. As to alternative sources of supply, the farmers were faced with a situation where all seed distributors placed disclaimers and exclusionary clauses in their contracts. Thus, this presents a situation where "goods [could] only be obtained from ... several sources on non-competitive terms ... and doing without [was] not a realistic alternative." *Allen, supra,* 171 N.W.2d at 692.[6]

■ Another pertinent factor considered by the district court in its unconscionability finding was that Harris Seed's salesman did not make Martin and Rick, who were uncounseled laymen, aware of the fact that the clauses in question altered significant statutory rights. Such a disclosure is an important consideration under Michigan law. *Mallory v. Conida Warehouses, Inc.,* 134 Mich.App. 28, 350 N.W.2d 825, 827 (1984); *cf. Johnson v. Mobil Oil Corp.,* 415 F.Supp. 264, 269 (E.D.Mich.1976) ("[b]efore a contracting party with ... immense bargaining power ... may limit its liability vis-a-vis an uncounseled layman ... it has an affirmative duty to obtain the voluntary knowing assent of the other party.").

Furthermore, although the terms of the 1972 sale appeared to be the same as in previous years (unknown to Martin and Rick), Harris Seed decided to discontinue the hot water treatment of its cabbage seed, a standard practice for the previous twenty-six years. This decision by Harris Seed was one which had far-reaching consequences to the purchasers of its cabbage seed. As noted above, hot water treatment had been successful in preventing black leg in Washington State produced cabbage seed since 1947, and although Martin and Rick were unaware of the potential effects of black leg, or indeed even what black leg was, Harris Seed had considerable expertise in such matters.

Another important consideration is the fact that the presence of black leg in cabbage seed creates a *latent* defect. Although in many cases the fact that a latent defect is present seems to be dispositive, *see Majors v. Kalo Laboratories, Inc.,* 407 F.Supp. 20 (M.D.Ala.1975); *Corneli Seed Company v. Ferguson,* 64 So.2d 162 (Fla. 1953), we note only that it is important to the disposition of this case.

■ Significantly, in the present case not only was the defect latent, but it was also one which was within the control of Harris Seed to prevent. Even if Martin and Rick had been apprised of and understood the significance of Harris Seed's decision to discontinue hot water treatment, they would have been unable to detect the presence of the disease in the seed until their crop had developed into young plants. If Harris Seed were permitted to rely on the

---

**6.** Harris Seed argued before the district court that the plaintiffs did not have to grow cabbage. However, we agree with the district court that, in light of the facts of this case, doing without would be an unrealistic alternative.

disclaimer and limitation clause to avoid liability under the facts of this case, the farmers who had no notice of, ability to detect, or control over the presence of the black leg could lose their livelihood. On the other hand, Harris Seed which had the knowledge, expertise and means to prevent the disease would only lose a few hundred dollars. Given the unique facts of this case, and giving "considerable weight" to the district court's decision that Michigan law would not permit the disclaimer and limitation clause to be enforced under such circumstances, we affirm the district court's finding of unconscionability.

### B.

The second major issue is whether the district court erred in granting the plaintiffs' motion for a judgment n.o.v. on the breach of implied warranty question. We begin by noting that the district court applied the correct standard of law in setting aside the jury verdict:

> In evaluating a motion for a judgment n.o.v., the fundamental principle is to keep at a minimum the interference with the jury. This principle takes root in the applicable standard which is exactly the same as the standard for granting a directed verdict: whether, without weighing the credibility of the witnesses or the weight of the evidence, reasonable persons could have reached only one verdict. *See, e.g., Minton v. Southern Railway Co.*, 368 F.2d 719 (6th Cir.1966); ....
> The court should view the evidence in the light most favorable to the party who received the jury verdict. *See, e.g., Perry v. Gulf, Mobile & Ohio R.R.*, 502 F.2d 1144 (6th Cir.1974)....
> In addition, when the party moving for a judgment n.o.v. is the party with the

burden of proof, the court should grant the motion only if the evidence supporting the verdict is so insufficient that it fails to meet the reasonable person test *and* the evidence in favor of the claimant is overwhelming. *See, e.g., Mihalchak v. American Drudging [Dredging] Co.*, 266 F.2d 875 (3rd Cir.1959), *cert. denied*, 361 U.S. 901 [80 S.Ct. 209, 4 L.Ed.2d 157] (1959); *Gray [Grey] v. First National Bank in Dallas*, 393 F.2d 371 (5th Cir. 1968), *cert. denied*, 393 U.S. 961 [89 S.Ct. 398, 21 L.Ed.2d 374] (1968)....

App. at 432.[7]

■ The district court also stated that "I suspect it was the advocacy skill of defendant's counsel that convinced the jury that plaintiffs sustained no damages." App. at 436. As it did at trial, Harris Seed argues that there is no breach of the implied warranty of merchantability where there is no economic loss. This argument is founded on the fact that Martin and Rick by selling the remaining portion of their 1973 cabbage crop at a higher than usual market price were able to make as much or more profit than they had in previous years. Thus, appellant argues that "[a]lthough black leg was damaging their cabbage, the law of supply and demand was making them ... whole."

This argument has some appeal, and like the district court, we can understand how the jury could have found for Harris Seed on the belief that Martin and Rick were not "damaged." However, we are persuaded by the district court's finding that the defendant's sale of diseased seed to *these two* plaintiffs did not create the increased market price. Similarly, we note that Martin and Rick purchased some healthy seed from other companies and some other

7. Harris Seed has not raised any objection to the standard used by the district court; however, we note that
 [i]n considering whether the motions for a directed verdict and for judgment notwithstanding the verdict should have been granted, we must look to the [Michigan] standards as to these motions. This follows from the Sixth Circuit adherence to the minority rule that in federal court diversity cases state law governs the standard for granting directed verdict and judgment notwithstanding the verdict motions.
 *Lewis Refrigeration Co. v. Sawyer Fruit Vegetable and Cold Storage Co.*, 709 F.2d 427, 430 n. 3 (6th Cir.1983). Furthermore, the standard used by the district court accurately reflects Michigan law. *See, e.g., Tucker v. Sandlin*, 126 Mich. App. 701, 704, 337 N.W.2d 637, 639 (1983).

farmers produced completely healthy crops. To further complicate the problem, there was evidence to the effect that the black leg epidemic was partially caused by the sale of diseased seed by other merchants and, thus, the rise in the market price of cabbage did not result entirely from Harris Seed's breach. Therefore, following the dictates of U.C.C. § 1–106 ("the remedies provided in this Act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed...."), in order to put Martin and Rick in the same position as many of their neighboring farmers who purchased healthy seed, we hold that the proper measure of damages as applied by the district court is the difference in value between the cabbage crops actually raised by these plaintiffs and the cabbage crops that they would have raised if their seed had not been diseased.

▮ Harris Seed also argues that there is no breach of implied warranty because the Federal Seed Act, 7 U.S.C. § 1551 *et seq.*, and the Michigan Seed Law, Mich. Comp.Laws Ann. § 286.701 *et seq.*, rather than the Uniform Commercial Code, set forth the full extent of Harris Seed's obligation of merchantability. We disagree with this argument and hold, as did the Michigan Court of Appeals in *Mallory v. Conida Warehouses, Inc.*, 134 Mich.App. 28, 350 N.W.2d 825, 828 (1984), that "the sale of seeds in question was clearly subject to the [warranty] provisions of the Uniform Commercial Code." [8]

▮ Harris Seed next argues that reasonable minds could differ on the issue of whether the implied warranty was breached, and, therefore, the district court erred in granting a judgment n.o.v. We disagree. The evidence that the seed sold to Martin and Rick carried black leg was uncontroverted as was the evidence that the black leg in the seed actually caused the plaintiffs' injury. As the district court held, "[d]efendant introduced no evidence offsetting plaintiffs' proofs which would allow reasonable people to conclude other than that plaintiffs sustained an injury caused by defendant's sale of a product with a defect making it not reasonably fit for its intended use." App. at 435. Harris Seed, however, argues that there was evidence that the seed would pass without objection in the trade. To support this they quote one expert who testified that "[y]ou could never say something is disease free," and that he had no knowledge of any seed company ever warranting or guaranteeing their seed against disease. Obviously, this does not respond to the case at hand where the seed marketed produced a crop which not only failed to be disease free but, in addition, was largely unsalable.

Harris Seed further argues that there was evidence that the spread of the disease was dictated by environmental and husbandry factors. In particular, it points to testimony to the effect that considerations such as how cabbage was irrigated and how the plants were transplanted were important factors that affected how far the black leg spread. However, the company failed to point to any evidence that these considerations were a factor in the case of Martin and Rick. In fact, the evidence presented at trial was that Martin and Rick followed the recommended instructions for preventing the spread of black leg.

Finally, Harris Seed argues that there was evidence that black leg *can be* transmitted from a number of sources. For example, the company states that the black leg could have been "windblown or carried over by tools or implements from other fields ...; that it had over-wintered on related cabbage weeds ... in or near Mar-

---

**8.** We recognize, as pointed out by Harris Seed, that *Mallory* is on application for leave to appeal to the Michigan Supreme Court, and that the Michigan Supreme Court has held that "[a] timely application for leave to appeal to [the Michigan Supreme Court] from a decision of the [Michigan] Court of Appeals effectively stays the Court of Appeals' decision as a final adjudication ... and denies it precedential force until ... some ... disposition of the case is announced." *People v. Phillips*, 416 Mich. 63, 330 N.W.2d 366, 371 (1982). Nevertheless, it is not inappropriate to use *Mallory* as an aid in ascertaining Michigan Law. *See supra* note 5.

tin's and Rick's fields ...; or that it had been lying dormant in Martin's and Rick's soil for up to two or three years...." However, in addition to the glaring absence of evidence that either of the fields had actually been infected by anything other than the seed which they purchased, Harris Seed has not denied that the seed sold to Martin and Rick was infected with black leg.

## III.

Giving "considerable weight" to the district court's conclusion that Michigan law does not permit the exclusion of the implied warranty of merchantability and limitation of remedy clause to be enforced within the special facts of this case, we affirm the district court's unconscionability holding under the peculiar facts of this case. Furthermore, having reviewed the district court's decision to grant the plaintiffs' motion for a judgment notwithstanding the verdict, along with the other issues raised by the appellant, we AFFIRM the decision of the district court in all respects.

MERRITT, Circuit Judge, concurring.

I write to explain my view of the unconscionability issue because I am normally loath to interfere with the contract the parties have made. Judge Hillman has handled this case with great care and intelligence. He found that the limitation of remedy and warranty disclaimer clauses were both procedurally and substantively unconscionable. The procedural unconscionability ruling was based on findings that the plaintiff farmers did not understand the meaning of an "implied warranty of merchantability," did not have its meaning explained to them, and could not have "bargained" concerning the disclaimer of implied warranty even if they had understood its import because the clause is contained in a standard seed order form which Harris Company seed salesmen must use and cannot modify. The District Court found that Harris Company used this gross disparity in knowledge, and hence bargaining power, to shift the risk of loss from diseased seeds to the party least able to discover and take precautions against disease. The District Court's factual findings on these matters are not clearly erroneous, and its ruling, narrow in scope, is that a legally sophisticated seller may not take advantage of a buyer's lack of legal expertise about warranties to shift, by cryptic language, the risk of loss due to latent, undiscoverable defects in the product sold.

Our decision, therefore, is based on the unequal position of the parties. If the parties had been roughly equal in their legal sophistication and had actually bargained over the limitation clauses, or if Harris Company's salesman had informed the legally unsophisticated farmers of the meaning of these clauses, we would have ground for upholding the limitation clauses as a bargained-for term in an informed, mutually understood exchange. But here, where the technical, legalistic disclaimer failed to inform the farmers as to the risk they were bearing, and where the seed company for the first time failed to take precautions against the risk by hot water treating the seeds, the key element of accurate and roughly equal knowledge regarding the meaning of the contract was absent. The principle of freedom of contract "is enhanced by a requirement that both parties be aware of the burdens they are assuming." *Johnson v. Mobil Oil,* 415 F.Supp. 264, 269 (E.D.Mich.1976). Our holding on unconscionability is thus an application of the fundamental principle of freedom of contract, and that principle would dictate a different result were both of the parties informed as to the meaning of the limitation clauses.