Mary A. CARLSON; Romana Stazen; Kenneth Owens; Richard B. Allen; C.V. Alston; Charles Armour, Jr.; Pierce Beauzay; Lewis O. Beck; Claude A. Black; Charles A. Blau; Raymond E. Booker; Robert L. Branham; Thomas R. Brown; Davis W. Brunson, Sr.; William E. Bubsey; Jimmy B. Burrell; Thomas H. Burrell; Frank Carruth; Willie Casey, Sr.; James F. Causey; Levi Chavous; Ruth D. Cooke; James W. Davis; John E. Driggers; William E. Dukes; Adelaide Dupre; Douglas T. Elkins; Bernest Ellerbe; Lois Elmore; John Erickson; Don Eykyn; Mary J. Fahey; Dr. Leslie E. Figa; George W. Fulmer; Charlaine Glover; Louise Grady; H.M. Grice; Grooms Oil Company; Dennis Harrison, Jr.; John Harte; Doyle C. Hayden; Lillian Hayes; George Hendricks; Jesse Herron; G.E. Hinson; Floyd Hiott; Kathleen Holliday; Robert Hudson; Paul Hughes, Jr.; Alfreda James; Larry Jenkins; Henry S. Johnson; George C. Kosko; Jim Leathenwood; Robert H. Lehman; Michael R. Lepors; Bobby G. Lott; Joe Lubelsky; T.W. Lyband; Daniel L. McAlpin; David McLellan; Purdy McLeod; Marvin Mabry; William Mapp, Jr.; Robert Marina, Jr.; Elizabeth J. Martin; W. Mason, Jr.; George Massey, Sr.; Samuel Masters; Elizabeth Mauney; James E. Mays; Vicki Mays; Merle Mellins; Fred Meyers; W. Irvin Molony; Dr. Carl Moore; Harry Morrow; Phillip Noel; Thomas O'Connor; Billy Parker; Jack L. Payne; Richard Pearl; Zelma Pettit; T.H. Preston; Harold B. Pruitt; Richard Puckharber; Laurie Quinn; Robert G. Richards; Walter L. Roark, Jr.; Rev. Daniel Runion; Oscar Russell; Robert F. Scholl; Livingston Scott; Frank D. Sellers; Jimmy Sheorn, Jr.; Dr. F.L. Shuler; Irene F. Simpson; Henry R. Sims; Paul C. Sova; Alex Stackhouse, Jr.; Sunbelt Thread & Tape, Inc.; Ann Sterne; Joshua Taylor; Paul Thode; Ann Thode; Bernice Todd; Doretha J. Todd; Mary Torrence; Early Vincent; Donald Wade; Dr. William Weathers; Mrs. David Weigle; George E. White; Leroy White; Horace Whit-

mire; Marvin Williams; David J. Worthington; Roy C. Young; Columbia Wholesale Company; David Ferguson; Robert E. Malpass; William J. Shepard, Jr.; Carl Shokes, Plaintiffs–Appellants, and

Vivian Chester; Henry H. Freudenberg; Robert Gotterba; E.M. Hanna; Gerald Harley; S. Todd and Judy Lewis; Karen Lucas; Courtney Plante; W.H. Singleton; Major R.C. Smith; Berneta Thames, Plaintiffs,

v.

GENERAL MOTORS CORPORATION, Defendant–Appellee.

No. 88–2168.

United States Court of Appeals, Fourth Circuit.

Argued March 6, 1989.

Decided Aug. 22, 1989.

Rehearing and Rehearing In Banc Denied Sept. 27, 1989.

Rehearing Denied Oct. 24, 1989.

Richard A. Lockridge (Vance K. Opperman, William Gengler, Opperman & Paquin, Minneapolis, Minn., Armand G. Derfner, Law Office of Armand Derfner, P.A., Charleston, S.C., B. Ervin Brown, II, Winston Salem, N.C., Beverly C. Moore, Jr., Sandra D. Benson, Stuart J. Logan, Moore & Brown, Washington, D.C., Arthur M. Kaplan, Edward B. Rock, David A. Kahne, Fine, Kaplan & Black, Philadelphia, Pa., on brief) for plaintiffs-appellants.

James H. Schink (Kirkland & Ellis, Chicago, Ill., Wade H. Logan, III, Holmes & Thomson, Charleston, S.C., Lee A. Schutz-

man, Detroit, Mich., on brief), for defendant-appellee.

Before PHILLIPS and CHAPMAN, Circuit Judges, and WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation.

PHILLIPS, Circuit Judge:

This case involves alleged defects in 5.7–liter diesel automobile engines manufactured by the defendant-appellee, the General Motors Corporation (GM), in model years 1981 through 1985. In a seventy-four page amended complaint filed on behalf of 183 named claimants and a prospective class of "similarly situated" car owners [1]—all of whom at one time purchased GM products equipped with diesel engines—plaintiffs charged that the engines were inherently defective and subject to frequent breakdowns, necessitating extensive and expensive repairs. Plaintiffs claimed, moreover, that GM's failure to correct these defects constituted a breach of the implied warranty of merchantability on the engines, hence a remediable violation of the Magnuson–Moss Warranty Act (the Act).[2]

In response to Rule 12(b)(6) motions filed by the defendant, the district court dismissed the claims of 130 of the named plaintiffs. At the same time, it denied plaintiffs' motion to amend the complaint and name additional claimants.[3] This appeal followed [4] and required us to decide: (1) whether GM diesel car owners who did not themselves encounter engine difficulties are nevertheless entitled to maintain actions for the recovery of "lost resale value"; and (2) whether the district court erred by dismissing the separate claims of some plaintiffs that GM's durational limitations on any and all implied warranties of merchantability were "unreasonable" and "unconscionable." Because we agree with the district court that the implied warranty of merchantability does not encompass claims for "lost resale value," we affirm its dismissal of those plaintiffs who alleged damages attributable only to the "poor reputation" of GM's diesel products. We also hold, however, that the district court erred by dismissing the "unconscionability" claims of other plaintiffs solely on the basis of the pleadings. We therefore reverse as to those claims and remand them for further proceedings.

I

For present purposes, we treat the named plaintiffs in this case as falling into three separate categories: (1) those who alleged that they encountered significant mechanical difficulties with the diesel engines in their GM cars *before* the applicable written warranties had expired; (2) those who alleged that they encountered engine problems only *after* all express warranties had expired; and (3) those who did not specifically allege that *their* diesel vehicles were defective, but instead only that the "poor reputation" of GM's diesel products resulted in compensable losses of "resale value." In a single order, the district court dismissed all named plaintiffs in the latter two categories. Because it did so for conceptually distinct reasons, however, we set

1. The named plaintiffs claim that, if they ultimately secure certification of a class, it will include as many as 596,364 current and former owners of GM cars and light trucks. *See* Amended Complaint ¶ 8, Joint Appendix at 21–22.

2. 15 U.S.C. §§ 2301–2312.

3. The district court's dismissal order threatened the frustration of plaintiffs' prospective ability to obtain class certification. A trial court may certify a Magnuson–Moss class action only if there are, at the time of certification, at least 100 named plaintiffs left in the case. 15 U.S.C. § 2310(d)(3)(C). Here, plaintiffs sought leave to amend their complaint and add parties for the obvious reason that, after entry of the dismissal order, only 53 named claimants remained. *See* Part V, *infra*.

4. Of course, the proceedings below have not yet come to an end, as the dismissal order left intact the claims of 53 of the original named plaintiffs. In response to a timely motion under Rule 54(b), however, the district court found "no just reason for delay" and entered final judgment against the plaintiffs covered by the order, thereby ripening their appeals. *See* Fed.R.Civ.P. 54(b); 28 U.S.C. § 1291; *Curtiss–Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7–8, 100 S.Ct. 1460, 1464–65, 64 L.Ed.2d 1 (1980).

out separately the salient facts underlying the claims of each group.

### A. *Plaintiffs Claiming that GM's "Durational Limitations" on the Operation of Implied Warranties Were Unreasonable and Unconscionable.*

Included in the first group are those plaintiffs who challenge GM's attempt to impose "durational limitations" on any and all implied warranties covering the diesel-equipped vehicles that are the subject of this dispute.

GM's express warranties on the diesel engines it manufactured in the 1981 and 1982 model years expired by their terms after 24 months or 24,000 miles. For model years 1983 through 1985, all express warranties on the engines expired after 36 months or 50,000 miles. Critical for present purposes, however, is that the warranty documents provided to purchasers of diesel-equipped GM vehicles included provisions purporting also to limit the operation of any *implied* warranties to the periods covered by the express guarantees.

Of the 183 plaintiffs named in the amended complaint, 107 alleged that they had first encountered substantial difficulties with their diesel cars only *after* all applicable express warranties had expired—hence after the purportedly "simultaneous" expiration of any implied warranties. Plaintiffs sought to avoid the obvious difficulties associated with GM's written disclaimers, however, by alleging further that the underlying "durational limitations" on the operation of any implied warranties were, as a matter of law, both "unreasonable" and "unconscionable"— hence "ineffective" under § 2308 of the Act:

§ 2308. Implied warranties.

(a) No supplier may disclaim or modify (*except as provided in subsection (b) of this section*) any implied warranty to a consumer with respect to [a] consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer product, or (2) at the time of sale, or within 90 days thereafter, such supplier enters into a service contract with the consumer which applies to such consumer product.

(b) For purposes of this chapter ..., implied warranties may be limited in duration to the duration of a written warranty of *reasonable duration,* if such limitation is *conscionable* and is set forth in clear and unmistakable language and prominently displayed on the face of the warranty.

(c) *A disclaimer, modification, or limitation made in violation of this section shall be ineffective for purposes of this chapter and State law.*

15 U.S.C. § 2308 (emphasis supplied). In response to GM's Rule 12(b)(6) motion to dismiss, however, the district court held that the implied warranty disclaimers were indeed both "reasonable" and "conscionable." Rejecting plaintiffs' claim that "the warranty limitations were unconscionable and of unreasonabl[y limited] duration because GM knew when it sold the cars that the diesel engines were defective," the court reasoned as follows:

A durational limitation on an implied warranty can mean only that the manufacturer warrants that the car is fit for ordinary purposes only for the duration of that warranty. In other words, the limitation can mean only that the unmerchantability must manifest itself in some manner during the period of the warranty in order for the purchaser to have a cause of action.

If the court accepted plaintiffs' argument, a plaintiff would need only to show that a manufacturer knew that a product would fail some time after the expiration of the implied warranty in order to recover for unmerchantability.... [T]his showing would rarely be difficult, and, thus, the time/mileage limitation on the warranty which Congress expressly permits would be rendered meaningless.

Turning to the specific limitations periods in this case, the court has no problem concluding that the time and mileage limits are reasonable and not unconscionable. In a class action differing from this case only in the model years of the cars involved, a United States Magistrate

found a one-year/12,000 mile warranty limitation reasonable. *Kaplan v. General Motors Corp.*, No. 81–CV–1252 (E.D. N.Y.1983). The warranties in the instant case last longer than those found reasonable in the *Kaplan* case, and this court finds that the limitations are both reasonable and consciable.

*Carlson v. General Motors Corp.*, No. 2:86–2674–1, slip op. at 13–14 (D.S.C. April 4, 1988). Plaintiffs now argue that the district court erred by ruling on the unconscionability question solely on the basis of the pleadings. Of course, their ultimate claim is that the amended complaint was sufficient on its face to survive GM's dismissal motion—at least insofar as it alleged facts which, if proven, would have established that the company's durational limitations on implied warranties were indeed "unreasonable" and "unconscionable."

B. *Plaintiffs Seeking Compensation Under the Implied Warranty of Merchantability for "Lost Resale Value."*

The second group of dismissed claimants includes the 17 named plaintiffs who did not allege that they encountered engine difficulties with their own cars, but instead claimed that widespread problems with GM's diesel products had substantially undermined public confidence in *all* diesel-equipped automobiles—and had in turn diminished markedly the "resale value" of the plaintiffs' cars. The district court held, however, that in *no* case may automobile owners maintain actions for breach of the implied warranty of merchantability if their cars have "operated without incident." *Id.*, slip op. at 7.

The warranty of merchantability guarantees that the warranted goods are fit for the ordinary purposes for which they are used. Thus, in this case, GM warranted that the cars it manufactured would be fit for driving and transportation. GM did not warrant to each purchaser that every other purchaser's car would be fit. As plaintiffs themselves point out, the alleged loss in resale value results from the poor reputation of the cars[, and] not from a manifest defect in any of the cars which have experienced no mechanical problems.

\*     \*     \*     \*     \*     \*

Only if a plaintiff first establishes that his or her car was of unmerchantable quality might he or she recover damages. Because the[se] plaintiffs ... cannot establish that their cars were not fit for the ordinary purposes for which cars are used, [their] claims must be dismissed. *Id.*, slip op. at 10–11. On appeal, these plaintiffs of course renew their argument that lost resale value demonstrably attributable to widespread product failures constitutes "compensable injury" and gives rise to cognizable claims for breach of the implied warranty of merchantability.

## II

At the outset, we pause to note that both of the questions presented in this case turn largely on principles of state law—notwithstanding the amended complaint's threshold invocation of a federal statute. Of course, resolution of the claims of both groups of dismissed plaintiffs ultimately requires that we determine the scope of the "implied warranty of merchantability," as that phrase is used in the Magnuson–Moss Warranty Act. As the district court recognized, however, the Act "operates *in conjunction with state law* to regulate the warranting of consumer products." *Id.*, slip op. at 6 (emphasis supplied). The statute itself defines an "implied warranty" as one "arising under State law (as modified by ... this title) in connection with the sale by a supplier of a consumer product," 15 U.S.C. § 2301(7), and courts have in turn found it "beyond genuine dispute that, as to both implied and written warranties, Congress intended the application of state law, except as expressly modified by Magnuson–Moss, in ... breach of warranty actions." *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1013–14 (D.C.Cir.1986). *See also Abraham v. Volkswagen of America, Inc.*, 795 F.2d 238, 247–49 (2d Cir.1986).

Each of the named plaintiffs in this case is a resident of South Carolina, and nearly all of them purchased their GM cars in that

state. Like 48 of her sister states, South Carolina has adopted Article 2 of the Uniform Commercial Code (UCC or the Code), *see* S.C.Code Ann. § 36–2–101 et seq., and we therefore must apply relevant provisions thereof to the full extent required for resolution of the substantive questions on which this case turns.

### III

We consider first whether the district court erred by dismissing the claims of those plaintiffs who challenged GM's "durational limitations" on the operation of implied warranties.

### A

The parties do not dispute that "the question of whether the limitation of a warranty to a designated period is unreasonable or unconscionable may be decided as a matter of law." *Bush v. American Motors Sales Corp.*, 575 F.Supp. 1581, 1583 (D.Colo.1984). Indeed, the rule is mandatory, rather than permissive. By its terms, UCC § 2–302 treats "unconscionability" as question of law; and it is therefore "the court—not the jury—[that] should make the determination of whether designated warranty periods are 'reasonable' or 'unconscionable.'" *Landsman Packing Co. v. Continental Can Co.*, 864 F.2d 721, 729

(11th Cir.1989) (reversible error for trial court to instruct jury on "reasonableness" of twelve-month limitation on all warranties). *See also Arkwright–Boston Mfrs. Mut. v. Westinghouse Elec.*, 844 F.2d 1174, 1184 (5th Cir.1988); *Martin v. Joseph Harris Co., Inc.*, 767 F.2d 296, 299 (6th Cir. 1985).[5]

This does not suggest, however, that a trial court can always determine "on the pleadings" whether given contractual language is unconscionable. To the contrary, unconscionability claims should but rarely be determined on the bare-bones pleadings—that is, with no opportunity for the parties to present relevant evidence of the circumstances surrounding the original consummation of their contractual relationship. The gravamen of nearly every such claim is that the parties' initial transaction was in some way tainted by "overreaching"; and it is for this reason that courts have developed "tests" of unconscionability which look, as a matter of necessity, to the presence or absence in a given setting of certain oft-encountered "indicia" of unfair bargaining. One frequently cited case holds, for example, that unconscionability "generally ... include[s] an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably fa-

---

**5.** UCC § 2–302 provides as follows:

(1) If the court *as a matter of law* finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

There has been considerable dispute over the applicability of § 2–302 to warranty disclaimers. Some commentators have argued that courts cannot find "unconscionable" those disclaimers which otherwise comply with the technical prerequisites of UCC § 2–316, which requires that implied warranty disclaimers be conspicuous and specific. *See, e.g.,* Leff, *Uncon-*

*scionability and the Code—The Emperor's New Clause,* 115 U.Pa.L.Rev. 485, 516–28 (1967). Others have made a strong case that warranty disclaimers which meet the § 2–316 standards still may be found unconscionable under § 2–302. *See, e.g.,* J. White & R. Summers, *Uniform Commercial Code* § 12–11, at 533–38 (3d ed.1988). Most courts have impliedly adopted the latter view and suggested that warranty disclaimers are subject to the § 2–302 unconscionability rules. *See, e.g., Martin,* 767 F.2d at 299.

Of course, the question need not be resolved in the present case, inasmuch as § 2308 of the Magnuson–Moss Act specifically invalidates implied warranty disclaimers which are "unreasonable" or "unconscionable." As the parties apparently have recognized, however, UCC § 2–302 and the numerous cases decided thereunder nevertheless must guide our analysis of whether, as claimed, GM's "durational limitations" on the operation of implied warranties were indeed unconscionable, since the federal statute expressly incorporates relevant principles of state law. *See* Part II, *supra.*

vorable to the other party." *Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.Cir.1965). In this circuit, we apply a similar test.

> The factors determining "unconscionability" are various: the nature of the injuries suffered by the plaintiff; whether the plaintiff is a substantial business concern; the relative disparity in the parties' bargaining power; the parties' relative sophistication; whether there is an element of surprise in the inclusion of the challenged clause; and the conspicuousness of the clause.

*Kaplan v. RCA Corp.*, 783 F.2d 463, 467 (4th Cir.1986). Trial courts obviously cannot apply these standards without carefully examining all relevant evidence of the setting in which the parties struck their bargain—and thus cannot resolve *bona fide* questions of unconscionability before the litigants have had an opportunity to present such evidence.

Courts therefore have strictly adhered to the UCC's express requirement that, "[w]hen it is claimed or appears ... that [a] contract or any clause thereof may be unconscionable[,] the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination." Uniform Commercial Code § 2–302(2). *See, e.g., Williams*, 350 F.2d at 449–50 (full development of record

is prerequisite to consideration of unconscionability claim because "[w]hether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction"). The basic principle is of course that, in order to avoid the danger that they might dispose of viable claims prematurely, courts must allow the parties to develop an adequate record. Otherwise, if "no affidavits, interrogatories, depositions, or evidence of any sort ha[ve] been submitted regarding the circumstances surrounding the transaction, [a court] can only speculate as to whether or not [a contractual term] was unconscionable." *Ferens v. Deere & Co.*, 639 F.Supp. 1484, 1488 (W.D. Pa.1986).[6]

■ We therefore hold that the district court erred by ruling, solely on the basis of the pleadings, that GM's durational limitations on any and all implied warranties were both "reasonable" and "conscionable" as a matter of law.[7] The court will be equipped to address that question only *after* plaintiffs have had an opportunity—whether in connection with a motion for summary judgment or at trial—to present evidence that, for example, they had no "meaningful choice" but to accept the limited warranties, or that the durational limitations "unreasonably" favored the defendant.[8] That said, we turn to the separate

---

6. *See also Luick v. Graybar Electric Co.*, 473 F.2d 1360, 1363 (8th Cir.1973) (plaintiff always "should be given a reasonable opportunity to present evidence" on his claim of unconscionability, after which "it is *then* within the province of the trial court to determine the issue") (emphasis supplied); Restatement (Second) of Contracts § 208 comment f (1981) ("A determination that a contract or term is unconscionable is made by the court in the light of *all the material facts*.... [T]he determination is made 'as a matter of law,' *but the parties are to be afforded an opportunity to present evidence as to commercial setting, purpose and effect* to aid the court in its determination.") (expressly adopting rule of UCC § 2–302) (emphasis supplied). *But see Bush*, 575 F.Supp. at 1583 (rejecting plaintiff's contention that "the reasonableness and conscionability of [warranty] limitations ... are factual questions that ought not be decided on a motion to dismiss"). *Cf. Farkar Co. v. R.A. Hanson Disc, Ltd.*, 583 F.2d 68, 71–72 (2d Cir.1978) ("*[i]n certain situations* the determination whether a particular provision is 'uncon-

scionable' creates a question of fact"; court goes on to hold that "here we find no facts to support placing into the 'unconscionable' category the [disputed contractual] provision") (emphasis supplied).

7. *See Carlson v. General Motors Corp.*, No. 2:86–2674–1, slip op. at 14 (D.S.C. April 4, 1988).

8. GM's reliance on the several cases in which implied warranty disclaimers have been upheld against "unconscionability" challenges is simply misplaced. As indicated, determining whether isolated contractual language is "unconscionable" requires analysis of the particular facts and circumstances surrounding an individual transaction or series of transactions. It is simply irrelevant that other courts may have found, for example, that 12–month/12,000–mile implied warranty limitations are "conscionable," since each case necessarily turns on variable evidence of the "commercial setting" in which challenged disclaimers were imposed.

question of whether there are nevertheless, as GM claims, alternative grounds on which we could affirm the dismissal order here at issue.

### B

The argument is straightforward. It is that, while the dismissed plaintiffs might well have been entitled to go forward and present evidence in support of a "facially viable" claim, their amended complaint simply "fail[ed] to allege any facts from which it would appear that the [durational] limitation[s] [were] unconscionable." Appellee's Br. at 25.

On our reading, however, the amended complaint more than sufficiently particularizes the alleged "overreaching." It specifies ten separate "reasons" why GM's imposition of durational limitations on the operation of implied warranties was both "unreasonable" and "unconscionable." Plaintiffs alleged, for example, that "[d]ue to unequal bargaining power and lack of effective warranty competition among dominant firms in the automobile manufacturing industry, [purchasers] had no meaningful alternative to accepting GM's attempted limitation of the duration of the implied warranty." Amended Complaint ¶ 24(d); J.A. at 27–28. Here, the claim is that the plaintiffs' contractual relationship with GM was tainted by an absence of "meaningful choice[s]" and a substantial "disparity in . . . bargaining power"—facts which, if proven, clearly would establish "unconscionability." See Kaplan, 783 F.2d at 467; Williams, 350 F.2d at 449. Similarly, plaintiffs' allegation that "diesel engines[ ] are designed to and ordinarily do function

for . . . period[s] substantially in excess of th[ose] specified in GM's . . . warranties" obviously implicates the "reasonableness" of the durational limitations—hence their effectiveness under § 2308 of the Act. See Amended Complaint ¶ 24(a); J.A. at 27.

Perhaps most significantly, plaintiffs also alleged that GM knew of inherent defects in its diesel engines—but failed to warn its customers of the consequential likelihood of "catastrophic failures." See Amended Complaint ¶ 24(c); J.A. at 27. The claim is, of course, that GM imposed its durational limitations on the operation of implied warranties in the course of bargaining tainted by the "concealment of relevant facts"; that, ipso facto, plaintiffs had no "meaningful choice" when they accepted the limitations; and that the disclaimers themselves were therefore unconscionable as a matter of law. Williams, 350 F.2d at 449. GM argues vigorously, however, that its alleged "knowledge" of various defects—even if proven—has no bearing whatsoever on the "reasonableness" of its warranty disclaimers.

The district court apparently agreed. It relied on the following passage from a recent Second Circuit decision, on which GM now stakes much of its case:

> [V]irtually all product failures discovered in automobiles after expiration of the [express] warranty can be attributed to a "latent defect" that existed at the time of sale or during the term of the warranty. All parts will wear out sooner or later and thus have a limited effective life. Manufacturers always have knowledge regarding the effective life of par-

As noted above, the district court had "no problem concluding that the time and mileage limits are reasonable and not unconscionable." Carlson v. General Motors Corp., No. 2:86–2674–1, slip op. at 14 (D.S.C. April 4, 1988).

In a class action differing from this case only in the model years of the cars involved, a United States Magistrate found a one-year/12,000 mile warranty limitation reasonable. Kaplan v. General Motors Corp., No. 81–CV–1252 (E.D.N.Y.1983) [unreported]. The warranties in the instant case last longer than those found reasonable in the Kaplan case, and this court finds that the limitations are both reasonable and conscionable.

Id. As the appellants point out, however, Kaplan is extremely doubtful precedent—even given the similarity of its facts—inasmuch as the magistrate's report was neither adopted nor even considered by the district court. Shortly after the report was filed, the parties in Kaplan settled out of court. In any event, Kaplan and its sister cases offer little help to us here. Notwithstanding what other courts may have done, the district court in this case should have undertaken independent analysis of the plaintiffs' "unconscionability" claims—based, of course, upon evidence in an adequately developed record.

ticular parts and the likelihood of their failing within a particular period of time.... A rule that would make failure of a part actionable based on such "knowledge" would render meaningless time/mileage limitations in warranty coverage.

*Abraham v. Volkswagen of America, Inc.,* 795 F.2d 238, 250 (2d Cir.1986). We think *Abraham* is clearly distinguishable, however, at least insofar as the plaintiffs there challenged the "reasonableness" of durational limitations on *express* limited warranties. The claim in this case is different. The plaintiffs here allege that, even if GM's limitations on express warranties were of "reasonable" duration, its knowledge of certain "inherent defects" in the diesel engines rendered all parallel limitations on *implied* warranties "unconscionable."

As should be clear, the crucial distinction is that drawn by the express terms of § 2308 between the "reasonableness" of limitations on express warranties and the "conscionability" of accompanying limitations on *implied* warranties. GM argues that therein lies no meaningful difference, inasmuch as § 2308 of the Act expressly authorizes limitations of implied warranties to the duration of "reasonably" limited express warranties. What the company ignores, however, is that the statute authorizes such limitations only if they are *also* "conscionable."[9]

The concepts of "reasonableness" and "conscionability" are obviously related; but for present purposes there are also, as suggested, certain critical differences. Determining whether temporal warranty limitations are of "reasonable duration" requires the court to determine nothing more than for how long, given past experience, consumers legitimately can expect to enjoy the use of a product "worry-free." Courts should focus, in other words, on whether purchasers should "reasonably" expect

that, after a certain period, the product might well need repair. Herein lies the essence of plaintiffs' claim that "diesel engines[ ] are designed to and ordinarily do function for ... periods substantially in excess of th[ose] specified in GM's ... warranties";[10] and we must agree that, in the face of this threshold challenge only to the "reasonableness" of the warranty disclaimers, GM's alleged knowledge of various "inherent defects" in its products simply has no relevance. *See Abraham,* 795 F.2d at 250. Considered in isolation, the claim presents but one, purely objective question: *viz.,* whether it is "reasonable" to expect a diesel engine supplied by any manufacturer to operate "without incident" for a given period of time. Here, the separate, subjective question of whether the manufacturer knew that its product would not meet those expectations simply need not—and indeed should not—ever arise.

Determining whether the imposition of warranty limitations was "unconscionable," however, requires a court to consider somewhat broader questions. "Objective reasonableness" is certainly relevant;[11] but so also is the fundamental fairness of the bargaining process. Indeed, it is for this reason that, when presented with a claim that the inclusion of certain contractual terms constituted unconscionable "overreaching," courts typically look to the parties' relative "bargaining power," "sophistication," "knowledge" and "expertise"—all of which constitute relevant evidence of whether their ultimate transaction was indeed tainted by an "absence of meaningful choice." *See Kaplan,* 783 F.2d at 467; *Williams,* 350 F.2d at 449. Surveying the cases, one noted treatise observes that "judicial finding[s] of lack of 'meaningful choice' ... [are] usually founded upon a recipe consisting of one or more parts of assumed consumer ignorance and several parts of seller's guile"; and it is at this level that courts have necessarily cast "un-

---

**9.** "For purposes of this chapter ..., implied warranties may be limited in duration to the duration of a written warranty of *reasonable* duration, if such limitation is *conscionable* ...." 15 U.S.C. § 2308 (emphasis supplied).

**10.** *See* Amended Complaint ¶ 24(a); J.A. at 27.

**11.** *See, e.g., Williams,* 350 F.2d at 449 (contract terms unconscionable if "unreasonably favorable" to one party or the other).

conscionability" in largely *subjective* terms. J. White & R. Summers, *Uniform Commercial Code* § 4-3, at 187 (3d ed. 1988). Relevant in any such case are specific allegations that a seller abused his "superior knowledge" and the buyer's relative ignorance, or that the seller's actions were in some other way akin to "fraud or duress in contract formation"—the claim of course being that such behavior implicates the seller's subjective good faith, the "evenhandedness" of the bargaining process, and thus the "conscionability" of challenged contractual language. *See id.* at 186.[12]

■ Here, proof that GM knew of and failed to disclose major, inherent product defects would obviously suggest that its imposition of the challenged "durational limitations" on implied warranties constituted "overreaching," and that the disclaimers themselves were therefore "unconscionable." When a manufacturer is aware that its product is inherently defective, but the buyer has "no notice of [or] ability to detect" the problem, there is perforce a substantial disparity in the parties' relative bargaining power. *Martin*, 767 F.2d at 302. In such a case, the presumption is that the buyer's acceptance of limitations on his contractual remedies—including of course any warranty disclaimers—was neither "knowing" nor "voluntary," thereby rendering such limitations unconscionable and ineffective. *Id.* at 301 (citing *Johnson v. Mobil Oil Corp.*, 415 F.Supp.

264, 269 (E.D.Mich.1976)). Evidence of the "knowledge of [a] stronger party that the weaker party will be unable to receive substantial benefits from the contract"—or any related showing that "the transaction involved elements of deception"—should in most cases "contribute to a finding of unconscionability in the bargaining process." Restatement (Second) of Contracts § 208 comment d (1981). *See also* 15 W. Jaeger, *Williston on Contracts* § 1763A, at 224 (1972) (by definition, unconscionability includes "the procedural abuse of unfair surprise, usually manifested as a concealment of important facts"). That is in large measure what the plaintiffs here have claimed; and we therefore cannot say that their amended complaint failed to allege facts which, if proven to the court's satisfaction, could establish that, as a matter of law, GM's durational limitations on the operation of implied warranties were indeed unconscionable.

We therefore hold that the district court erred by dismissing the claims of those named plaintiffs who alleged that they first encountered substantial difficulties with their diesel-equipped GM cars only after the purported expiration of all express and implied warranties. In so doing, we express no opinion and intimate no view on what may be proven on the matter, as opposed to what we have held was, at this stage, adequately pleaded to withstand the Rule 12(b)(6) motion.

---

12. We note in passing that several commentators have drawn distinctions similar to that between what we have called "objective reasonableness" and "conscionability." Most would treat the concepts as variations on the same theme, however, and denominate them "subspecies" of "general unconscionability." White and Summers, for example, distinguish between "procedural" and "substantive" unconscionability.

> Substantive unconscionability involves those one-sided terms of a contract from which a party seeks relief (for instance, "I have the right to cut off one of your child's fingers for each day you are in default"), while procedural unconscionability deals with the process of making a contract—"bargaining naughtiness" (for instance, "Just sign here; the small print on the back is only our standard form"). Each of these branches of unconscionability

has common-law cousins; procedural unconscionability looks much like fraud or duress in contract formation, and substantive unconscionability reminds us of contracts or clauses contrary to public policy or illegal.

J. White & R. Summers, *Uniform Commercial Code* § 4-3, at 186 (3d ed.1988) (footnote omitted). *See also* Leff, *Unconscionability and the Code—The Emperor's New Clause*, 115 U.Pa.L. Rev. 485, 487 (1967) (distinguishing between allegations of "bargaining naughtiness" and inclusion of objectively "harsh" contractual terms). This distinction between separate "branches" of unconscionability obviously corresponds closely to the differentiation suggested in the text between "objective reasonableness" and general "unconscionability"—terms we have used only because they are suggested by the language of § 2308. *See* note 9, *supra,* and accompanying text.

## IV

■ The remaining substantive question is whether the district court also erred by dismissing those plaintiffs who alleged damages based solely on the "diminished resale value" of their diesel-equipped GM cars.

We think it fair to say that plaintiffs' theory here is a novel one. Indeed, they cite no case in which a court has specifically held that the implied warranty of merchantability protects against unanticipated losses in resale value. Instead, plaintiffs rely primarily on cases in which: (1) courts certified or upheld the certification of nationwide classes whose members included "all owners" of an allegedly defective vehicle; and (2) the damages allegedly suffered by the members of such a class included "diminished resale value."

We find these cases singularly unhelpful, however, for the simple reason that in not one did a court address the substantive question of whether the implied warranty of merchantability protects against an unanticipated diminution in secondary market values. To the contrary, most of the courts specifically reserved that question for decision at another, more appropriate time—i.e., outside the context of rulings on Rule 23 motions for class certification. In *Walsh v. Ford Motor Co.*, 106 F.R.D. 378 (D.D.C.1985), for example, the trial court certified an "all owners" class of plaintiffs, notwithstanding the defendant's protestation that many of the class members' cars had "performed as warranted and therefore [were] merchantable." *Id.* at 396. The court specifically noted, however, that it was certifying the class solely on the basis of the "commonality" of the prospective members' interests, and that it was *not* determining separately whether the plaintiffs had stated a "viable" cause of action for breach of the implied warranty of merchantability. *Id.* at 397. Essentially the same can be said for each of the remaining cases on which the plaintiffs principally rely. *See In re Cadillac V8-6-4 Class Action*, 93 N.J. 412, 461 A.2d 736, 743 (1983) (approving certification of "all owners" class where plaintiffs charged breach of implied warranty of merchantability on account of "common defect"; court holds that allegation of "loss-of-bargain" damages is sufficient to state cause of action, but relies on cases where such loss occurred as result of manifest defects in *plaintiffs'* cars); *Landesman v. General Motors Corp.*, 42 Ill.App.3d 363, 1 Ill. Dec. 105, 107–08, 356 N.E.2d 105, 107–08 (1st Dist.1976) (court certified class of plaintiffs claiming damages partly attributable to diminished resale value, but specifically declined to decide question of whether allegations supported viable cause of action); *Anthony v. General Motors Corp.*, 33 Cal.App.3d 699, 109 Cal.Rptr. 254 (2d Dist.1973) ("all owners" class certification; no discussion of viability of underlying cause of action).

Finding no real support for their position in the cases, plaintiffs are therefore left with the bare language of § 2–314 of the Code, which defines and gives shape to the "implied warranty of merchantability." Under § 314(2)(c), "[g]oods to be merchantable must be at least such as ... are fit for the ordinary purposes for which such goods are used." Predictably, plaintiffs argue from this that, since "[o]ne of the ordinary purposes ... of purchasing new automobiles ... is to be able to resell the car eventually," Appellant's Br. at 35, the implied warranty of merchantability encompasses "loss of resale value" claims.

We are not persuaded, however, that § 2–314 reaches nearly that far. The difficulty is that, so far as these plaintiffs are concerned, GM's diesel-equipped cars have served the traditionally recognized "purpose" for which automobiles are used. Since cars are designed to provide transportation, the implied warranty of merchantability is simply a guarantee that they will operate in a "safe condition" and "substantially free of defects." *Overland Bond & Invest. Corp. v. Howard*, 9 Ill. App.3d 348, 352, 353, 292 N.E.2d 168, 172–73 (1st Dist.1972). Thus, "where a car can provide safe, reliable transportation[,] it is generally considered merchantable". *Taterka v. Ford Motor Co.*, 86 Wis.2d 140, 271 N.W.2d 653, 655 (1978). So defined,

"merchantability" clearly does not encompass consumer expectations that a product will hold its value; and it is for this reason that several courts have rejected claims similar to those pressed here. *See, e.g.,* *Yost v. General Motors Corp.,* 651 F.Supp. 656, 657–58 (D.N.J.1986) (dismissing claim for breach of implied warranty of merchantability on automobile engine where plaintiff failed to allege any actual mechanical difficulties with his car); *Feinstein v. Firestone Tire & Rubber Co.,* 535 F.Supp. 595, 602 (S.D.N.Y.1982) (no claim under implied warranty of merchantability on tires where plaintiffs experienced no failures); *Skelton v. General Motors Corp.,* 500 F.Supp. 1181, 1191–92 (N.D.Ill.1980) (no claim for breach of implied warranty of merchantability where plaintiffs alleged that concealed substitution of certain transmissions for others advertised as standard equipment rendered automobiles "less desirable to the purchasing public"), *rev'd on other grounds,* 660 F.2d 311 (7th Cir.1981).

We simply cannot say that the implied warranty of merchantability encompasses more than these courts have held, and we therefore affirm the district court's dismissal of those plaintiffs who alleged damages attributable only to "lost resale value."

## V

We turn finally to the appellants' claim that the district court should have granted plaintiffs' motion to amend their complaint and add a sufficient number of new parties to satisfy prospectively the 100–named–plaintiffs requirement for certification of a Magnuson–Moss class action.

In view of our overall disposition of the case, we think it would not be helpful—certainly it is not now necessary—to address this contention. On the remand we will order, the claims of all those plaintiffs who challenged GM's "durational limitations"

on the operation of implied warranties will be revived. At that point, there will again be more than 100 named plaintiffs with live claims to pursue, thereby satisfying the statutory precondition to class certification without any need—at least for that reason—to add more plaintiffs by amendment.[13] While it is of course possible that later developments may again lead to dismissals reducing the number of named plaintiffs to less than 100, any motion for the allowance of amendments at that point would present so different a set of considerations that anything we said about the propriety of disallowing the earlier motions to amend would probably be beside the point.

## VI

In summary, we reverse that portion of the district court's order dismissing the claims of those plaintiffs who alleged breaches of warranty by reason of mechanical difficulties occurring after the purported expiration of all express and implied warranties; we affirm that portion dismissing the claims of those plaintiffs who alleged breaches of warranty solely by reason of diminutions in resale value; and we remand the case for further proceedings consistent with this opinion.

SO ORDERED.

---

**13.** An attachment to the district court's dismissal order lists 108 named plaintiffs who alleged that they encountered difficulties with their diesel-equipped GM cars only after the purported expiration of express and implied warranties. *See* J.A. at 276–78. It would appear, therefore, that our disposition of this appeal leaves intact the claims of 161 of the plaintiffs named in the amended complaint: 108 who challenged the "durational limitations" on implied warranties, and 53 who were not covered by the Rule 12(b)(6) order.